In the Matter of the Application of JOHN F. CASSIDY for Admission to the Bar of the State of New York.

Second Department, November 13, 1944.

*Per Curiam.* The Committee on Character and Fitness of the Second Judicial District, by a divided vote of five to two, have certified that in their opinion the above-named applicant possesses the necessary character and fitness to become a member of the Bar of this State and have recommended that he be admitted.

The members of the Committee reached their conclusions after devoting many days to hearing the testimony pro and con and many more days to the consideration of the voluminous papers presented. The record discloses the great length of time spent by them. The individual reports of the Committee members show their painstaking care.

The members of the Committee do this work voluntarily and without compensation. The court and the entire Bar of the Second District are under a very deep obligation to the Committee. It is a pleasure for the members of the court to make their appreciation a matter of record, even though in this instance the majority of the court is constrained to differ with the majority of the Committee and to agree with the minority in its finding and recommendation.

An applicant may be admitted to the Bar only if this court " shall be satisfied that such person possesses the character and general fitness requisite for an attorney and counsellor-at-law * * *." (Judiciary Law, § 88, subd. 1.) The possession of such character and the possession of such fitness are conditions precedent. Membership in the Bar is not a right; it is a privilege burdened with the specified statutory conditions which, as to every proposed new member, must be met at the time of admission. (Cf. *Matter of Rouss,* 221 N. Y. 81, 84; Judiciary Law, § 88.)

Even if we disregard the oral testimony, the import of the undisputed documentary evidence establishes the applicant's belief in the resort to force to overthrow the existing form of government of the United States. These documents were not in evidence at the applicant's trial in the Federal court in 1940 on the charge of conspiracy to overthrow the government, where he was acquitted. They were submitted for the first time at the hearings before the Committee. They consist of: (1) the applicant's private notes of speeches which he subsequently delivered (App. Exs. 4C, 4J, 4M and 4U); (2) copy of a letter, dated September 13, 1939, which the applicant addressed to the Reverend Charles E. Coughlin (in the record without exhibit number); (3) the copy furnished by the applicant of a speech which he made in Philadelphia on November 24, 1941,

at a meeting of the Christian Front (App. Ex. 11); and (4) a verbatim transcript of statements made by the applicant in a speech on March 1, 1939 (Complainants' Ex. D).

The record discloses that the applicant believes there is need for changing the structure of our government. With his views in this respect we have no concern, nor with his methods, so long as they are legal and constitutional. The documentary evidence demonstrates, however, (a) that the applicant is convinced that the constitutional processes are inadequate to effect the changes which he considers necessary or desirable in our existing form of government; (b) that the applicant deliberately advocated and counseled the unlawful formation of armed units for use against what he considered subversive elements; and (c) that if the government failed to act promptly to suppress such subversive elements these privately organized armed units should take the law into their own hands and act independently without regard to the government.

Conceding that the applicant was sincere in his avowed purpose of preparing to suppress an imminent insurrection, the means which he advocated were directly contrary to both the State and Federal Constitutions and statutes. (U. S. Const., art. I, § 8, art. IV, § 4; National Guard Acts, U. S. Code, tit. 32, § 17 *et seq.*; N. Y. Const., art. XII, § 3; Military Law [State], § 241 *et seq.*; 1941 Atty. Gen. 390; *Hamilton* v. *Regents,* 293 U. S. 245; *Presser* v. *Illinois,* 116 U. S. 252, 267–268.) The plain and inevitable effect of the consummation of the applicant's plans or beliefs would be to displace our constitutional form of government and to permit him and his associates to arrogate to themselves the powers of the government. No matter how altruistic the claimed motive may be, such a plan clearly is illegal. (Cf. *People* v. *Gitlow,* 195 App. Div. 773, 782, affd. 234 N. Y. 132; Penal Law, §§ 160–162.)

The applicant has the right, of course, to advocate that the Constitution be changed and that those charged with the administration of the government be removed from office. " One of the prerogatives of American citizenship is the right to criticize public men and measures — and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *(Baumgartner* v. *United States,* 322 U. S. 665, 673.) This is the right of free speech which is guaranteed to every person by the first amendment to the Federal Constitution. But this right contemplates only the advocacy of legal and constitutional means of change. It is lost when it is abused by urging the use of

illegal and unconstitutional methods. (Cf. *People* v. *Gitlow,* 195 App. Div. 773, 785–789, affd. 234 N. Y. 132; *Hartzel* v. *United States,* 322 U. S. 680, majority and minority opinions.)

In an effort to justify his beliefs and the methods he advocated to make them effective, the applicant professed to rely upon the second amendment to the Federal Constitution. Indeed, in his letter of September 13, 1939, he expressed his "jubilation that there is the Second Amendment." That amendment, however, does not grant a license to carry arms. "The right to keep and bear arms is not a right conferred upon the people by the federal constitution." (*Cases* v. *United States,* 131 F. 2d 916, 921; *United States* v. *Cruikshank,* 92 U. S. 542, 553; *People ex rel. Darling* v. *Warden of City Prison,* 154 App. Div. 413, 420; *Presser* v. *Illinois, supra.*)

Before the Committee the applicant stated (Minutes, pp. 195–196) that the armed units he advocated were intended to be placed at the disposal of the government in suppressing a threatened insurrection. Conceding the *bona fides* of such belated expression of intention, the very fact that he advocated the creation of such a private army demonstrates his unfitness to become a member of the Bar of this State. There can be no justification for the organization of such an armed force. Its existence would be incompatible with the fundamental concept of our form of government. The inherent potential danger of any organized private militia, even if never used or even if ultimately placed at the disposal of the government, is obvious. Its existence would be sufficient, without more, to prevent a democratic form of government, such as ours, from functioning freely, without coercion, and in accordance with the constitutional mandates.

The record also demonstrates that the applicant lacks that high standard of veracity required of an officer of the court. Many contradictions and inconsistencies appear in his statements. It will suffice to make reference to only three of such contradictions and to cite the page numbers of the record where they may be found:

(1) As to the proposed bombing or dynamiting of a certain building: Compare the applicant's various statements at the Federal trial. (Digest of Minutes, pp. 89–90; Minutes, pp. 3631–3632; 3635–3636; 3640; 3650.)

(2) As to the proposed manufacture of bombs: Compare the applicant's statements before the Committee (Minutes, pp. 687–690) and at the Federal trial (Minutes, pp. 3633–3634) with his other statements at that trial. (Digest of Minutes,

pp. 85, 90; Minutes, pp. 3544–3547; 3629–3630; 3633–3634; 3637; 3650; 3653–3654.)

(3) As to the applicant's condemnation or denunciation of a part of our citizenry: Compare the applicant's statements before the Committee (Minutes, pp. 150, 236–237) and at the Federal trial (Minutes, p. 3399) with the applicant's statements in his own original notes. (App. Ex. 4V.)

There exists no constitutional inhibition against any person's, if he so desires, becoming a religious bigot and a sower of religious bigotry, provided he does not interfere with the exercise of religious freedom by others. In determining the fitness of a candidate for admission to the Bar this court has never given any consideration to his religious belief, the lack of such belief, or to his religious intolerance. Attacks upon organized religion of any faith are regrettable exhibitions of the lack of true religious convictions or the lack of any religious faith at all. But with that phase of an applicant's character this court is not concerned. And in the present case, as well as in the irrelevent case cited in the dissenting opinion, no consideration was given to the applicant's alleged denunciation of any religious or racial group.

We are not unmindful that the applicant has been acquitted by a jury after trial in the Federal court upon an indictment charging him with conspiracy to overthrow the government of the United States. But acquittal in a criminal action cannot be deemed to be *res judicata* here upon any issue, for the purpose and scope of an inquiry to determine an applicant's character and fitness to become a member of the Bar are essentially different. (Cf. *Matter of Kane* v. *Rudich,* 256 App Div. 586, 587; *Matter of Hardenbrook,* 135 App. Div. 634, 636; *People ex rel. Wood* v. *Department of Health,* 144 App. Div. 628, affd. 202 N. Y. 610.) Conduct not descending to the level of guilt of the violation of a criminal statute may well present an insuperable obstacle to admission to the Bar if such conduct evinces a lack of that " character and general fitness requisite for an attorney and counsellor-at-law ". (Judiciary Law, § 88, subd. 1.)

Accordingly, the application must be denied.

HAGARTY, J. (dissenting). I join in commending the members of the Character Committee for their labors in general, and in this case in particular. I dissent from the decision about to be made and vote to confirm the determination of the Committee and to admit the applicant. The Committee, by a vote of five of its seven members, after painstaking care in the consid-

eration of the proof over many months, recommend to this court that the applicant be admitted.

The grounds upon which the applicant is about to be denied admission to the Bar of this State may be divided into two groups. In the *first* group are the conclusions that the applicant believes in the resort to force to overthrow the existing form of government of the United States and that there is need for changing the structure of our government; that he is convinced that the constitutional processes are inadequate to effect the changes which he considers necessary or desirable in our existing form of government; that he deliberately advocated and counseled the unlawful formation of armed units for use against what he considered subversive elements and, if the government failed to act promptly to suppress such subversive elements, that these privately organized armed units should take the law into their own hands and act independently, without regard to the government.

Notwithstanding affirmative proof to the contrary, all these conclusions, it is asserted, are established by cited proof which is said to be " undisputed documentary evidence. "

Part of this proof is characterized as " a verbatim transcript of statements made by the applicant in a speech on March 1, 1939 (Complainants' Ex. D)." This Exhibit D consists of a typed transcription, made by one Rubin, of alleged excerpts from the remarks of speakers at a meeting sponsored by the Flatbush Anti-Communist Committee at Erasmus Hall High School on March 1, 1939. The Exhibit is prefaced as follows: " (Only portions of the speeches appear because the notes were taken in longhand. The persons taking notes wrote down verbatim those statements which he thought were deserving of special notice. The statements are therefore enclosed in quotes because they were the exact words of the speackers (sic).) " These excerpts so written down in longhand consist, in part, of three or more lengthy and complicated sentences, with interpolations of audience reaction. Rubin testified, in the absence of the applicant, with respect to statements made by the applicant in the course of speeches. He also testified that it was he who had made the notes constituting the alleged excerpts contained in Exhibit D, which was then received in evidence. At a subsequent hearing before the Character Committee, the applicant was permitted to cross-examine Rubin and did so with respect to his testimony, of which a transcript had apparently been furnished to the applicant. During the course of this cross-examination, the witness referred to his notes, which he had

submitted on his previous appearance. The applicant stated: "I haven't seen any notes from Mr. Rubin." A member of the Character Committee replied: "I don't think you need them. You are welcome to see them." Thereafter the cross-examination continued with respect to the previous testimony of Rubin as distinguished from the excerpts contained in Exhibit D. Under these circumstances, this exhibit cannot fairly be characterized as "undisputed," particularly in the light of the fact that the applicant submitted his own notes of his remarks at the very meeting referred to in Exhibit D (see applicant's Exhibits 4T-Z) which bear little or no similarity to it and parts of which are also cited in the majority opinion as "undisputed documentary evidence" in support of the conclusions reached. The credibility of this witness as to the writing was for the Character Committee in precisely the same measure as it was with respect to the rest of his testimony.

Another document cited and quoted as undisputed evidence is a photostat of a typed letter addressed to "Rev. Charles E. Coughlin" and dated September 13, 1939. It is stated in the majority opinion that this is a copy of a letter of the applicant and that he addressed it, notwithstanding that the paper was never offered or received in evidence, that it bears no signature, that there is nothing to show that it was written by the applicant or addressed by him or that he was ever charged with it or that he had any knowledge of it.

The rest of the cited proof consists of speeches or notes of speeches, or portions thereof, voluntarily submitted by the applicant. These writings consist primarily of attacks on communism. The position of the applicant is set forth on the pages of the minutes referred to in the majority opinion in connection with the statement therein contained that he advocated "armed units." Eliminating questions, represented by asterisks, this is his testimony (S. M., pp. 195, 196): "I mean that the citizenry of the United States for the protection of their own republic, to put down any uprising, or to repel any kind of invasion, should long since have been trained in the use of the rifle and should long since have been encouraged to defend their homes and their land, and particularly when the country is faced by a revolution. I not only think it is their right but it is their duty, and I recommend it highly, that every citizen, regardless of his faith or race, should learn how to defend this country in case the revolution should come quickly enough to overtake the whole country. That is what I have been recommending. * * *. It should be done under the

guidance of the authorities, and they should put themselves at the disposal of the locally-constituted authorities in case the revolution should occur. * * *. I was referring to the possibility of a Communist revolution, which, to me and many more people, seemed almost imminent in 1938.'' There is not a word in any of this advocating '' armed units,'' and elsewhere in his testimony the applicant expressly disclaimed advocacy of armed platoons.

The following are quoted from the exhibits invoked by the majority of this court and they are the only portions which have any possible relevancy. In the applicant's notes of a speech made November 22, 1938 (Ex. 4C) this appears: '' The Communist Revolution in U. S. begun. We pledge our lives, our fortunes and our sacred honor to put it down, even if we have to raise a Franco to do it. Told you of glories of our Country. Extolled the benefits of our civilization. Compared our Republic with those of dictators. Warned you that tendencies in our nation, our state and this, our city, pointed toward the establishment of a dictatorship of the left. Preached ' Imminence of Revolution.' '' Exhibit 4J is one of four pages of notes of a talk made January 4, 1939, and contains this: '' Our Gov't gives comfort to them [Communists]. Refuses to withdraw recognition of U. S. S. R. Refuses to deport alien agitators. Refuses to stop revolutionary propaganda. We'll stop it by the Christian Front. Organization to uphold Am. Govt & Ch. Civiliz Men only eligible. If our Gov't does not stop them, we will. We citizens have picked our enemy and they are here amongst us — not abroad.'' Exhibit 4M is one of five pages of notes of a speech made January 25, 1939. It contains this: '' Continue Demonstration each Sunday outside Radio Stations but be Christian in your actions and Christian in your remarks. Do not allow Communists to create an incident of hostility or breach of the peace as they attempted last Sunday at the location of Radio Station W. O. R. There are enough red-blooded Americans on the police force to handle these alien agitators, without requiring you to soil your hands or belittle your Christian dignity by engaging in skirmishes with them *now*. Our day is yet to come.'' Exhibits 4U and 4V are two of seven pages of notes of the speech above referred to made at Erasmus Hall on March 1, 1939. They read in their entirety as follows:

'' Under our Republican form of govt in U. S. everyone has equality under the law.

" Those who today are pretending to uphold the Constitutional Right of Free speech, & free press are the very people who are exercising every power at their command to secure a monopoly on these sacred rights that were purchased by the blood of Christian patriots in 1775.

" Let us not pussy foot about this issue. There is still time to settle our mutual grievances by peaceful means. Failing that, there is but *one alternative*.

" Let no one accuse us of misusing the public schools to preach religious intolerance. This meeting was paid for tonight and the auditorium was hired from the City of New York. Quite different from the situation in Brooklyn College, where Room 4200 was used on Monday night by the American Student Union and the Young People's Socialist League for a mass meeting to lift the embargo on arms to Spain.

" There was an example of X baiting that well deserves inquiry by N. C. J. C.

" Read Circulars. (both) comment.

" Describe it as an educational subject.

" Taxpayer wants to see what return.

" 1.   Chairman

" 2.   Rosenberg — Pres. Student Council.

" (a)  Franco — Press.   Soldiers ' saying ' Mass Feeding poor.

" (b)  Writer — preachers & bakers.

" 3.   Capt. Leonard Lamb (Jewish)

" (a)  Abraham Lincoln Brigade.

" (b)  Christian killers invading Spain.

" (c)  What right has an American Jew to go to Spain & kill Christians and then to come back here & solicit funds on the stage of an auditorium in Bklyn College, so that the slaughter of X Spain might be completed.

" These are the liars who want to save American Democracy, when they are affiliated with the Communist International, that has obliterated Democracy wherever it set its foot either directly by setting up a communist govt, or indirectly by causing the rise of fascism.

" Let no one say that I am unfair to point out that these men are Jews, because the whole Jewish community of U. S. holds the same views as they hold."

In the twelve-page speech made November 24, 1941, at Philadelphia (Ex. 11) the following appears:

" Lest one might misconstrue my words, and derive the impression that I am advocating a passive and subservient

attitude, let me emphasize with all the strength of my being that, on the contrary, I call for a forthright program of active resistance to the war-malers (sic) and their hirelings throughout the length and breadth of America.  *  *  *

" Secondly, you must begin now to ride roughshod over the Smear Brigade, so that they will BEGIN to understand ' the time of their captivity is at hand.' Too LONG, have they abused the hospitality that America extended to them. Too LONG have they poured forth their venom on a patient and tolearnat (sic) people. The day of reckoning is fast approaching; and soon their horrid hymn of hate will be changed to a plea for MERCY. God grant that they may mend their ways before  *  *  * before it is too late.''

These passages do not even tend to support many of the conclusions of the majority and do not sustain any of them.

The *second* ground upon which denial is based is that the record also demonstrates that the applicant lacks that high standard of veracity required of an officer of the court. Three " contradictions " are set forth. The third of these has to do with " the applicant's condemnation or denunciation of a part of our citizenry." The basis of the finding of a " contradiction " here is that the applicant, despite denial, did denounce a religious or racial group, although it is also stated in the opinion for the majority that " no consideration was given to the applicant's alleged denunciation of any religious or racial group." In his testimony before the Character Committee, at the cited pages, the applicant testified " I remember distinctly having been spoken to by people in the audience and on the streets in this fashion: ' Why do you attack the Jews from your platform? ' My answer was this: ' I have never attacked any race from the platform, and I have always preached racial tolerance from the platform.' The trouble with the current situation is this: that whenever anybody attacks Communism, the Communists themselves confuse the issue and try to make the people of Jewish faith believe that we are attacking Jews. We are opposed to Communists,'' (end of p. 150, s. m.). The applicant denied that at any of his public addresses he said or intimated that there was a Jewish conspiracy to overthrow the present form of government in this country, that most of the Jewish people were members of the Communist party, that there was in Washington a New Deal Jewish organization or that Communism and Judaism were synonymous (pp. 236, 237). At page 3399 of the minutes of the trial the applicant denied that he had ever uttered an anti-Semitic speech or that he had ever said all Jews were Communists.

In support of this position, the applicant offered his alleged copies of addresses made by him, a portion of one of which is said to be inconsistent with this testimony. There is no inconsistency. Even if his conception of what constitutes a denunciation of a part of our citizenry be erroneous, it is that conception to which he testified. Exhibit 4V, cited by the majority, which is above set forth, contains nothing in contradiction of the specific matters of fact as to which the applicant testified before the Character Committee.

Assuming denunciation of a part of our citizenry, it is no ground for denial of admission. This court recently (1940) admitted a candidate over the disapproval of a majority of the Character Committee, who opposed the application on the grounds that he " entertains views antagonistic to complete loyalty to the Government of the United States " and " considers it wrong to salute the flag of the United States." This candidate subscribed to the publications and statements of one Rutherford and of publications known as " Cure " and " Intolerance " of the Watch Tower Bible & Tract Society containing expressions of which the following are illustrative: " The Roman Catholic religious organization has an unbroken record of meddling in the politics and commercial affairs of the nations, and of using fraudulent and dishonest schemes to gain control of the political offices of the nations. That religious organization fully approved and backed up the brutal war recently prosecuted by the Fascists of Italy against the harmless people of Abyssinia. The Catholic religious organization is now openly supporting the war of rebellion against the nation of Spain, and which war has caused the untimely and brutal slaying of multitudes of innocent persons. That same religious organization, which falsely claims to operate in the name of Christ, is now in an alliance with Japan in her prosecution of a malicious war of conquest against China. The Roman Catholic religious organization, operated by the Hierarchy, is the greatest scheme that has ever been operated to keep the people in ignorance of the truth. * * * It is reported on good authority that in many of the Roman Catholic cathedrals in America boxes that have the appearance of piano boxes are moved into basements of these organizations, and are filled with guns and ammunition. * * * For many centuries the Catholic hierarchy has operated the most cruel, wicked and defamatory organization that has ever been on the earth. They employ coercion and the gag, and any other unlawful means necessary to accomplish their cruel purposes. When they want

someone killed they make the killer believe that the priests can fully absolve him from all wrong and clear him from all punishment, either here or hereafter. * * * I insist that the clergy of the papal hierarchy represent the Devil and not Jehovah God. I challenge the pope of the Catholic hierarchy to appoint any man he will on earth, to represent him and his organization and that we debate this question by radio before the American people, each side to pay one-half the cost. You must choose whether you will follow the Devil's representatives or follow Christ." From these and kindred statements one would be led to believe that Rutherford and his followers were engaged in a controversy with the Roman Catholic Church, but the Watch Tower Bible & Tract Society also declared " It does not indulge in controversy, * * * ." The candidate testified before the Character Committee, viz: " I would reconcile it this way: that we engage in no controversies as to their religious views. That does not mean that we should not publish the truth, and the truth is as contained in the book of ' Cure ' that you hold in your hand. What is said there is a fact and if it offends the susceptibilities of the Catholics it is just too bad."

The whole subject lies within the realm of free speech and, as to the alleged inconsistency, I see no distinction between the facts in the present application and those in the above considered case.

As to the remaining alleged contradictions, it should be emphasized that the reference in the *Per Curiam* opinion to the digest of proof adds nothing to the trial minutes. The digest is merely a summary of the trial minutes.

The proof at the trial of the applicant and others in the Federal court, in general, is to the effect that an association known as the Action Committee, as well as by other names, recruited in large part from the membership of an association known as the Christian Front, of which the applicant was the leader, was headed by one Bishop. The closeness of the affiliation between the two groups was one of the questions of fact litigated upon the trial. The version of the applicant was that they were independent entities, and he claimed that he was not a member of the Action Committee, but was permitted to attend its gatherings by reason of his status in the Christian Front. Differences arose between the applicant and Bishop in October of 1939, as the result of which some, but not all, of the members of the Christian Front withdrew from membership in the Action Committee. The proof with respect to the applicant was concerned not only with the activities of this so-called

Action Committee, but, in accordance with a charge of conspiracy, with his relationship to it up to the time of his difference with Bishop, his arrest having taken place in January of 1940. The jury, by their verdicts, distinguished between the members of the two groups in that there was disagreement on one or both counts with respect to defendants who were members of the Action Committee, whereas there was an acquittal of those who were not.

Under the direction of the Character Committee, a one hundred and fifty-eight page digest of the proof adduced at the trial before the United States District Court conducted between the 5th day of April and the 28th day of June, 1940, was prepared and circulated among its members. It is this digest to which reference has been made. The Committee went to the length of procuring the presence before it of a Federal agent to testify with respect to allegedly inconsistent testimony at the trial and it also had prepared a written amplification of the digest of the testimony of the applicant at the trial as contrasted with the testimony of this agent before the Committee, as hereinafter will be considered.

The only ground advanced by the two members of the Character Committee for their votes to deny the application was that they did not believe the applicant " was truthful before this Committee." In the light of the failure of a single member of the Character Committee or of this court to find the applicant guilty of any charge or allegation on which the indictment was founded, on the proof adduced at the trial in the Federal court I do not perceive the significance of the discussion at the conclusion of the opinion of the majority with respect to the difference in measure of proof and lack of conclusiveness of the verdict.

The applicant, after his difference with Bishop, induced one Viebrock to remain in the Action Committee so that he would be in a position to inform him of its activities. Viebrock reported to the applicant that Bishhop had asked him, Viebrock, to make some bombs. The applicant testified at the trial that he had agreed to the suggestion of Viebrock that it would do no harm to make containers if in that way Viebrock could stay close to Bishop so that the latter would think that Viebrock was working for him, but that he cautioned Viebrock " * * * for Heaven's sake, do not make any bombs." Thereafter Viebrock also advised the applicant that there had been a discussion in the Action Committee about blowing up the *Daily Worker*. On cross-examination, the applicant was taxed with certain

answers he had made to questions of Federal agent Criss at the time of his arrest. This is the vital testimony: " Q. And on January 13th, as you sat there, or the 14th, under the questioning of Agent Criss, you had in mind the fact that Viebrock had reported to you everything, including the manufacture of bombs? A. No, sir, including the manufacture of bomb containers. Mr. Criss asked me a specific question. Q. He asked you about bombs? A. Yes, sir. Q. You denied any knowledge? A. Yes, sir. Q. You knew about bomb containers? A. I did. Q. Did you volunteer that to Mr. Criss? A. I did not. Q. Were you asked this question and did you give this answer: ' Q. You know nothing about them? A. No.' A. That is right. ' Q. Suppose we say that within your group we found a bunch of bombs? A. If you brought in a bunch of bombs it is something you didn't get from anybody in the Christian Front that I know of. We have no such thing as that.' Did you answer that? A. I said that. ' Q. Well, then, you have been attending these other side organizations? A. No, sir, I beg to differ with you. I was never a member of any side organization.' Did you say that? A. I said that."

The questions of the prosecuting attorney were obviously based on a transcript of a statement by the applicant to Criss at the time of his arrest and the statement on this subject from which the questions were framed, as read into the record by Criss at the time he testified before the Committee in May of 1942, is as follows:

" Criss: What is the idea of building these bombs? Cassidy: What bombs? Criss: I am asking you what is the idea of building these bombs? Cassidy: I know nothing about bombs. Criss: You know nothing about any bombs? Cassidy: I have frequently heard people discussing the use of bombs in Spain during the discussions on Spain but I know nothing about them. Criss: Were you fellows planning to go to Spain and start bombing over there? Cassidy: I don't intend to go anywhere. In the discussion period of the revolution in Spain I never heard of any bombs. I know nothing about bombs. Criss: You know nothing about them? Cassidy: No. Criss: Suppose we say that within your group we found a bunch of bombs? Cassidy: If you brought in a bunch of bombs — it is something you didn't get from anybody in the Christian Front that I know of. We have no such thing as that. Criss: The Christian — well, but you have been attending these other side organizations? Cassidy: No, sir. I beg to differ with you. I was never a member of any side organization. Criss: Not of Bishop's organization?

Cassidy: Never a member of Bishop's organization. Criss: You attended the meeting though, didn't you? Cassidy: I went down to a house and had conversations with fellows sitting there, yes, but that doesn't mean I am attending a meeting of any association."

The testimony at the trial and this statement show that the denials of knowledge by the applicant were made to questions taxing the applicant and his group with the building and secretion of bombs, although Criss knew, at the time, of the distinction between the group of the applicant and that of Bishop. There was, then, no inconsistency between the statement to Criss on this subject, the applicant's testimony on cross-examination predicated on this statement, and the information obtained from Viebrock as to the activities of the Action Committee.

On the subject of the dynamiting of the newspaper, these questions and answers of the applicant appear on cross-examination at the trial:

" Q. Were you asked these questions and did you make these answers: ' Q. Did you hear anything about dynamiting the *Daily Worker?* A. No, sir.' Did you say that to Mr. Criss? A. I said it to him. ' Q. Never? A. Never heard anything.' A. Right."

It is clear that in order to determine whether the questions and answers which the applicant verified at the trial were inconsistent with his knowledge of discussion by the Action Committee of dynamiting the *Daily Worker,* as in the preceding instance, they would have to be considered in the light of their context. As indicated by the applicant in his redirect testimony at the trial, these questions related to what the applicant had heard at meetings of the Action Committee. At his appearance before the Committee, Criss gave no testimony at all on this subject. The applicant had never been shown any transcript containing these questions and answers. He had been arrested, assigned to three agents and questioned during the night, approximately four months prior to testifying at the trial. In the absence of the transcript or other proof showing the setting of the questions and answers, it cannot be concluded that the applicant was inconsistent. The transcript which Criss produced at the hearing was retained by him on the ground that he lacked authority to leave it with the Committee. The Department of Justice subsequently refused a copy of it to the Committee. The applicant has never been heard on this matter. He had entered the armed service prior to the testimony of

Criss and all subsequent witnesses before the Committee. He is still in the armed service and has achieved a creditable record.

These are the three alleged contradictions which, it is stated, suffice to support the conclusion of the majority herein. It is also stated in the majority opinion that " Many contradictions and inconsistencies appear in his statements." I do not know of any. I do know that with one exception no other alleged inconsistency has been pointed to or reported by a single member of the Character Committee or of this court. The single exception consists of remarks attributed to the applicant in a speech he made at Philadelphia, to the effect that he was abusive in his references to the President of the United States. It is tacitly recognized in the majority opinion that this· was an irrelevant subject, as indeed was the proof with respect to " alleged denunciation of any religious or racial group " by the applicant, which constitutes the bulk of the record. Yet it is invoked for the only purpose that the introduction of such proof could subserve, namely, to create an issue as to veracity. The precise words at issue were " liar " and " insane." The applicant and another witness denied that he had used the words. The applicant submitted a purported copy of his speech (Ex. 11), which he claims to have read, which does not contain the words. The Committee received an alleged text of the speech containing these words and the word " pagan " from the Philadelphia Bureau of Police. The Committee procured the presence before it of the municipal peace officers who are alleged to have co-operated in reconstructing the speech and also two State motor policemen and a civilian who testified that they also were present. These witnesses made no written notes during the course of the speech, which was one of a number throughout a long evening. The first officer testified: " It was impressed on my mind as being that way — the words that were used may have been entirely different " and " I could be wrong " and that it is possible he (the witness) made a mistake. The second officer testified that he was hazy as to whether the applicant had read from a paper and as to the use of the disputed words, " I said I thought that and from reports that were submitted as to others," that it was his " impression," and " That I will not say and not swear that he used either of those words." The third officer testified that the applicant used the words " to the best of my recollection " and when asked if his recollection might be imperfect, answered: " I don't know." The fourth officer testified that he was giving

his best recollection rather than the very words of the applicant and, when other statements were quoted to this witness, he was unable to recall whether or not the applicant had made them in the course of the speech. The municipal peace officers were present for the purpose of protecting an unidentified stenotypist. The State peace officers were not permitted by their commissioner to testify except under the condition " that any cross-examination will not be permitted to show how they happened to be present or their purpose for being present"' at the meeting. As to the civilian witness, the Committee had been cautioned by an officer in the Navy Yard where he was employed, in answer to its request that leave be granted him to testify, that he " has exhibited a phobia of enthusiastic desire to clothe himself with the characteristics of a self-appointed sleuth in the past, and it is suggested that his testimony be verified carefully before it is considered." My reaction is that this alleged proof did not present even a fair question of fact, and that the members of the Character Committee who saw and heard the witnesses were fully justified in rejecting it as unworthy of belief.

It is my opinion that the proof utterly fails to support the conclusions contained in the opinion of the majority.

I dissent and vote to confirm the report of the Character Committee recommending the admission of the applicant to the Bar of this State.

CLOSE, P. J., CARSWELL, JOHNSTON and ADEL, JJ., concur in Per Curiam opinion; HAGARTY, J., dissents and votes to admit the applicant, in opinion.

Application for admission to the Bar denied.