LAW STUDENTS CIVIL RIGHTS RESEARCH COUNCIL, INC., Toby B. Golick, James C. Mauro, Jr. and William H. B. Rodarmor on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Lowell WADMOND, Felix A. Muldoon, Edwin L. Weisl, Mark F. Hughes, Bruce Bromley, Monroe Goldwater, Arthur H. Schwartz, Bernard Teencher, Thomas B. Dyett and Alfred A. Giardino as chairman and members of the Appellate Division First Department Committee on Character and Fitness of Applicants for Admission to the Bar, Defendants.

Stephen Martin WEXLER, H. Gabriel Kaimowitz, Robert M. Cover, the Columbia Law Students Guild, New York City Chapter of National Lawyers Guild, Plaintiffs,

v.

The SUPREME COURT OF the STATE OF NEW YORK, APPELLATE DIVISION, FIRST JUDICIAL DEPARTMENT; the Supreme Court of the State of New York, Appellate Division, Second Judicial Department; the Committee on Character and Fitness, Supreme Court of the State of New York, Appellate Division, First Judicial Department; the Committee on Character and Fitness, Supreme Court of the State of New York, Appellate Division, Second Judicial Department, Defendants.

68 Civ. 2917, 2938.

United States District Court
S. D. New York.
Feb. 17, 1969.

See also, D.C., 291 F.Supp. 772.

Alan H. Levine, New York City, (Jeremiah S. Gutman, Steven Goldsmith, New York City) for plaintiffs Law Students Civil Rights Research Council, Inc., and another.

Leonard B. Boudin, New York City, (David Rosenberg, Rabinowitz, Boudin & Standard, New York City), for plaintiffs Stephen Martin Wexler, and another.

Daniel M. Cohen, Asst. Atty. Gen., (Louis J. Lefkowitz, Atty. Gen. of the State of New York) for defendants.

David W. Peck, New York City, (Michael M. Maney, Sullivan & Cromwell,

New York City) for individual defendants and defendant Committees.

Before FRIENDLY, Circuit Judge, and BONSAL and MOTLEY, District Judges.

FRIENDLY, Circuit Judge:

These two actions for injunctive and declaratory relief, invoking our jurisdiction, 28 U.S.C. § 1343(3), to enforce the Civil Rights Act, 42 U.S.C. § 1983, challenge the constitutional validity of procedures for admission to the New York bar, both generally and particularly as applied in the First and Second Judicial Departments.[1] The plaintiffs in 68 Civ. 2938 are three candidates certified as having passed their bar examinations, the Columbia Law Students Guild, and the New York City Chapter of the National Lawyers Guild. The plaintiffs in 68 Civ. 2917 are the Law Students Civil Rights Research Council, Inc., an organization of some 1500 law students with chapters at sixty law schools including four in New York City, and three law students who plan to apply for admission to the New York bar when eligible. Both actions are sought to be maintained as class actions on behalf of all persons seeking or planning to seek such admission. The defendants are the Appellate Divisions and their Justices and the Committees on Character and Fitness for the First and Second Judicial Departments and their members.

Section 90(1) (a) of the New York Judiciary Law, McKinney's Consol.Laws, c. 30, provides

Upon the state board of law examiners certifying that a person has passed the required examination, or that the examination has been dispensed with, the appellate division of the supreme court in the department to which such person shall have been certified by the state board of law examiners, if it shall be satisfied that such person possesses the character and general fitness requisite for an attorney and counsellor-at-law, shall admit him to practice as such attorney and counsellor-at-law in all the courts of this state, provided that he has in all respects complied with the rules of the court of appeals and the rules of the appellate divisions relating to the admission of attorneys.

This provision is implemented by Article 94 of the Civil Practice Law and Rules enacted in 1962, which adopts rules previously promulgated by the Justices of the Appellate Divisions. The rules[2] comprising Article 94 direct the appellate division in each judicial department to appoint a committee to investigate the character and fitness of each applicant for admission, R. 9401; prescribe that "unless otherwise ordered by the appellate division, no person shall be admitted to practice without a certificate from the proper committee that it has carefully investigated the character and fitness of the applicant and that, in such respects, he is entitled to admission," R.9404; and authorize such committee, "subject to the approval of the justices of the appellate division, * * * to prescribe and from time to time to amend a form of statement or questionnaire on which the applicant shall set forth all the information and data required by the committee and the appellate division justices, including specifically his present and such past places of actual residence as may be required * * *," R. 9404. Rule 9406 directs:

No person shall receive said certificate from any committee and no person shall be admitted to practice as an attorney and counselor at law in the courts of this state, unless he shall

---

1. The state of New York is divided by law into four judicial departments. N.Y. Const. Art. 6, § 4; Judiciary Law § 70. The First Department embraces the counties of New York and Bronx; the Second, the counties of Richmond, Kings, Westchester, Putnam, Dutchess, Orange, Rockland, Nassau, Suffolk, and Queens. Judiciary Law §§ 70, 140.

2. Provisions of the Civil Practice Law and Rules which are denominated as Rules may be changed by the judicial conference of the state. See CPLR § 102 and Judiciary Law § 229.

furnish satisfactory proof to the effect:

> 1. that he believes in the form of the government of the United States and is loyal to such government
>
> \* \* \*

The complaints attack a number of these provisions as violating the First Amendment to the Constitution as made applicable to New York by the Fourteenth. The statutory provisions, notably § 90(1) (a) of the Judiciary Law and the quoted portion of Rule 9406, are challenged as being so vague and impermissibly broad as to have a "chilling effect," see Dombrowski v. Pfister, 380 U.S. 479, 494, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), on plaintiffs' exercise of their First Amendment rights. Rule 9406 is challenged as allowing investigation into mere beliefs and denial of admission for them and as placing on applicants a burden of proof they cannot constitutionally be made to bear. The questionnaires prescribed by the two committees are criticized as requiring disclosure of acts and associations beyond the scope of proper inquiry. Believing that substantial constitutional issues had been tendered, Judge Motley requested the Chief Judge of the Circuit to convoke a court of three judges, 28 U.S.C. §§ 2281, 2284, and this was done. Judge Motley reserved judgment on the motion made by plaintiffs in 68 Civ. 2917 to consolidate the two suits pursuant to Fed.R.Civ.P. 42(a); we grant the motion and have considered the cases together. Plaintiffs have sought summary judgment or, if that not be granted, a preliminary injunction and discovery. The defendants have moved for dismissal of the complaint or, in the alternative, for dismissal so far as the complaint relates to the statutes [3] and remission of the issues concerning the questionnaires to Judge Motley.

## I.

Before proceeding to the merits we must examine claims made with respect to the standing of the plaintiffs, the suability of the defendants, the failure to join the Court of Appeals or its members, and the desirability of abstention.

■■■ With respect to the individual plaintiffs, defendants admit the standing only of the three who have passed the bar examination. They contend however, that, so far as concerns the statutes, these three have no need for equitable relief since, if the character committee should refuse them certification on an impermissible ground, they can obtain an adequate remedy by applying to the appellate division and, if the state courts persist in refusal, by seeking review in the Supreme Court; and that, so far as concerns the questionnaires, their objections are at most a matter for a single judge since each questionnaire is effective only in part of the state. We find it unnecessary to evaluate this argument.[4] For we believe the three plaintiffs who are law students intending to apply for admission have standing to seek equitable relief since they have set themselves apart from the public at large sufficiently to have standing to protest statutes governing admission to the bar that may inhibit exercise of First Amendment rights during the period of their study.

3. We shall use that term as embracing the Rules, see note 2.

4. Defendants also argue that the plaintiffs who have passed the examination have, by presenting their certificates to the appellate division and obtaining questionnaires from the character committee, commenced "proceedings in a State court" within the anti-injunction statute, 28 U.S.C. § 2283, and that the grant of an injunction would violate that statute. Even if this were true, it would not prevent us from granting an injunction in favor of the law students. Further, we see no merit in the argument, quite apart from any question whether the Civil Rights Act creates an exception to § 2283. The purpose of the anti-injunction statute is to prevent a state court defendant from invoking the aid of a federal court to block an action instituted against him—not to prevent a state court applicant from seeking federal aid to eliminate what he considers an unconstitutional roadblock created by the state.

Cf. Gart v. Cole, 263 F.2d 244, 250 (2 Cir.), cert. denied, 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); Overseas Media Corp. v. McNamara, 128 U.S.App.D.C. 48, 385 F.2d 308 (1967); Davis, Standing: Taxpayers and Others, 36 U.Chi.L.Rev. 601, 617–628 (1968). Since these students raise a substantial constitutional question with respect to at least one of the statutes, a court of three judges is required for that purpose; the argument that attacks on the questionnaires should be remitted to a single district judge will be examined later in this opinion. We also have no occasion now to consider the standing of the various organizations that have joined in the complaints.

■■ In considering whether an injunction or a declaratory judgment should be issued, we start from the principle of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that when officers administering a state statute act in a manner that exceeds constitutional limits, they have no claim to sovereign immunity. Against this is the equally well settled principle that a judge exercising his judicial function is not liable for damages under 42 U.S.C. § 1983. Pierson v. Ray, 386 U.S. 547, 553–555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

■■ While the interest served by the latter principle in making the state judge free "to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants," without "fear that unsatisfied litigants may hound him with litigation charging malice or corruption," Pierson v. Ray, supra, 386 U.S. at 554, 87 S.Ct. at 1218, is an important one, its applicability to an injunction is by no means clear. See United States v. McLeod, 385 F.2d 734, 738 (5 Cir. 1967) (Wisdom, J.). We fail to perceive what interest would be served by holding federal courts to be powerless to enjoin state officers from acting under a statute that allegedly deprives citizens of rights protected by the Civil Rights Act or promulgating

regulations that are alleged to have that result simply because some of them are robed and others have been appointed by those who are. Rather it would seem anomalous that while federal courts could entertain a complaint similar to the plaintiffs' if made with respect to other licensed professions, such as medicine or accountancy, they are powerless with respect to admission to the bar. The grant of injunctive relief in a case like this would not have the *in terrorem* effect on state judges that the threat of a subsequent damage action would have; rather, it would furnish a definitive ruling on a point of federal law for their future guidance, and, as shown above, fn. 4, would not infringe the policy expressed in the federal anti-injunction statute, 28 U.S.C. § 2283, proscribing injunctions that would stay "proceedings in a State court." The criteria set forth in Dombrowski v. Pfister, supra, for the grant of the extraordinary relief of injunction against the enforcement of a state statute are alleged to be present here. Plaintiffs do not challenge a state court's disposition of an individual case, but attack as "overly broad and vague regulations of expression," see 380 U.S. at 490, 85 S.Ct. at 1123, the rules and regulations promulgated and administered by the appellate divisions and their delegates. The alleged infringement of First Amendment rights of law students cannot be dissipated by the processing of particular individuals' applications for admission to the bar. These factors, which were "controlling on both the exercise of equitable power and the abstention issue" in Dombrowski, see Cameron v. Johnson, 381 U.S. 741, 755, 85 S.Ct. 1751, 14 L.Ed. 2d 715 (1965) (White, J., dissenting), make appropriate our consideration of equitable relief even though the defendants would be immune from liability in damages for their administration of the challenged procedures, see Saier v. State Bar of Michigan, 293 F.2d 756 (6 Cir.), cert. denied, 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961); Gately v. Sutton, 310 F.2d 107 (10 Cir. 1962); Clark v. Washington, 366 F.2d 678 (9 Cir. 1966) (judges and their delegates immune for

roles in disbarment proceedings). To hold otherwise would be to leave without a remedy a significant class of the deprivations of federal rights under color of state law that Congress intended the federal courts to redress under 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

■ We likewise see no force in defendants' argument that the suits should be dismissed, pursuant to Fed.R.Civ.P. 19, for failure to join the Court of Appeals or its members. While plaintiffs' attack on the "statutory scheme" governing admission to the bar takes in a Rule of the Court of Appeals, Rule VIII, the involvement of that rule does not necessitate joinder of its authors any more than an attack on the application of a statute requires joinder of the legislature. Moreover, the rule, adopted to implement Judiciary Law § 90, is attacked only for failing to furnish standards more precise than those found in § 90 and CPLR Article 94, and thus failing to rescue the procedure from the defects that allegedly inhere in the latter provisions. Section 90 and Article 94 have been enacted by the Legislature, and they place actual administration in the appellate divisions and their delegates, the committees on character and fitness, not in the Court of Appeals. There is no practical obstacle to adjudication of the constitutionality of this procedure in the absence of the Court or its members. Contrast Association For the Preservation of Freedom of Choice, Inc. v. Wadmond, 215 F. Supp. 648, 651–652 (S.D.N.Y.1963).

■ With respect to abstention, defendants have not made clear what debatable issues of construction state proceedings could resolve. Their contention is rather that admission to the bar is so peculiarly a matter of state concern that its resolution should be left to the state courts, subject, of course, to review by the Supreme Court. But that Court has given short shrift to similar claims in matters, equally of state concern, such as education, McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), and state employees, Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

We therefore proceed to the merits.

## II.

■ We need not tarry long over the claim that the requirement of § 90(1)(a) of the Judiciary Law that entrance to the bar shall be allowed only to a person who "possesses the character and general fitness requisite for an attorney and counsellor-at-law" is impermissibly vague. We perceive no significant distinction between this and California's requirement of "good moral character," duplicated in many other states, which the Court said in Konigsberg v. State Bar of California, 366 U.S. 36, 40–44, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961), could not "well be drawn in question." Indeed, New York's requirement is somewhat more definite in specifying that the character traits required are those directly related to suitability for the practice of law. Once it is granted that the state can constitutionally require something more of applicants for admission to the bar than absence of the kind of criminal record that would warrant expulsion, as *Konigsberg* must be taken to have decided, the state must perforce use language of some generality. Such words, like others familiar in our law, acquire content through years of administration, see, e. g., Re Peters, 221 App.Div. 607, 225 N.Y.S. 144, aff'd, 250 N.Y. 595, 166 N.E. 337, rearg. denied, 252 N.Y. 572, 170 N.E. 148 (1927) (admission denied because of disbarment in another state); Re Greenblatt, 253 App.Div. 391, 2 N.Y.S.2d 569 (1938) (admission denied because of misrepresentations to character committee about applicant's dismissal from college for misconduct); Application of Cassidy, 268 App.Div. 282, 51 N.Y.S.2d 202, aff'd on rehearing, 270 App.Div. 1046, 63 N.Y.S.2d 840, aff'd, 296 N.Y. 926, 73 N.E.2d 41 (1944) (admission denied because applicant urged creation of armed units for forceful overthrow of government and made inconsistent statements indicating lack of

veracity). See also Schware v. Board of Bar Examiners, 353 U.S. 232, 247, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (concurring opinion of Mr. Justice Frankfurter). Plaintiffs' affidavits and briefs are eloquently silent about instances where New York has unjustifiably denied admission for lack of "the character and general fitness requisite for an attorney and counsellor-at-law."

### III.

 Rule 9406 demands more discussion. Plaintiffs' initial criticism is procedural. They say the requirement that the applicant "shall furnish satisfactory proof" of belief in our form of government and loyalty to it unconstitutionally imposes a burden of proof in violation of Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). We think that case fairly distinguishable on two grounds: The statute condemned in *Speiser* applied to all veterans claiming property tax exemption, and the Court differentiated loyalty oaths required of "a limited class of persons in or aspiring to public positions by virtue of which they could, if evilly motivated, create serious danger to the public safety." 357 U.S. at 527, 78 S.Ct. at 1343. Lawyers, who are officers of the courts, fit the latter rubric. In Konigsberg v. State Bar, *supra*, 366 U.S. at 54, 81 S.Ct. 997, the Court noted this distinction. Rule 9406 is also sustainable on the other ground taken in *Konigsberg,* 366 U.S. at 55, 81 S.Ct. 997, namely, the lack of "unequivocal indication" that it imposes a true burden of proof as distinguished from a burden of coming forward with evidence. We see no reason why New York may not impose the latter with respect to a subject concerning which the applicant has detailed knowledge but the committees would be required to make extensive investigation.

Plaintiffs' substantive attack is that Rule 9406 has the breadth branded as unconstitutional in such important recent cases as Baggett v. Bullitt, *supra,* 377 U.S. 360, 84 S.Ct. 1316; Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); and Keyishian v. Board of Regents, *supra,* 385 U.S. 589, 87 S.Ct. 675 (1967). When one examines the decisions, in contrast to culling phrases from them, they are plainly distinguishable. What the Court found defective in *Baggett* about the teachers' oath specified in the Washington laws of 1931[5] was the part exacting a promise that the affiant would "by precept and example promote respect for the flag and the institutions of the United States of America and the State of Washington, reverence for law and order and undivided allegiance to the government of the United States." The Court held that to require teachers to make so broad a promise provided no "ascertainable standard of conduct" and required "more than a State may command." 377 U.S. at 372, 84 S.Ct. at 1322. The defect in *Elfbrandt* was not the oath required of state employees, see 384 U.S. at 12, 86 S.Ct. at 1239, but the statute subjecting to prosecution for perjury and to discharge from public office anyone who during his "'term of office or employment knowingly and wilfully becomes or remains a member of the communist party of the United States or its successors or any of its subordinate organizations or any other organization having for one of its purposes the overthrow by force or violence of the government of the state of Arizona or any of its political subdivisions." This was condemned as including "those who join an organization but do not share its unlawful purposes

5. "I solemnly swear (or affirm) that I will support the constitution and laws of the United States of America and of the State of Washington, and will by precept and example promote respect for the flag and the institutions of the United States of America and the State of Washington, reverence for law and order and undivided allegiance to the government of the United States." 377 U.S. at 361–362, 84 S.Ct. at 1317.

**126**

and who do not participate in its unlawful activities * * *," 384 U.S. at 17, 86 S.Ct. at 1241, a position foreshadowed by Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). See also United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Haskett v. Washington, 294 F.Supp. 912 (D.D.C. 1968). Finally, what the Court struck down in *Keyishian* was a "complicated plan," 385 U.S. at 601, 87 S.Ct. 675, imposing a variety of ill defined restraints on teachers in New York's public schools and colleges.

Rule 9406 is not an oath; the oath required to be taken upon admission to the bar, Judiciary Law § 466, is the "constitutional oath," New York Constitution, Art. XIII, § 1, "that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of ———, according to the best of my ability." The constitutionality of this oath is established by Knight v. Board of Regents, 269 F.Supp. 339 (S.D.N.Y.1967), aff'd per curiam, 390 U.S. 36, 88 S.Ct. 816, 19 L.Ed.2d 812 (1968). Neither does Rule 9406 hang *in terrorem* over persons admitted to the bar, like the statutes condemned in *Elfbrandt* and *Keyishian;* it goes to belief at the time of admission only. The claim is rather that the alleged undue breadth of the Rule will have an unconstitutionally inhibiting effect on persons who contemplate seeking admission to the bar, notably law students, since they will fear lest becoming members in controversial organizations or engaging in protests will be taken to evidence lack of belief in the form of government of the United States or disloyalty to it.

If one assumes a proper implementation of Rule 9406, plaintiffs' apprehensions seem unwarranted. The Rule does not prescribe a formula to which the applicant must adhere but is rather a direction to the committees and the appellate divisions to guide them in performance of their functions under the statutory scheme. It instructs these bodies, before forwarding an applicant to take the constitutional oath, to satisfy themselves through analysis of the factual data before them of his belief in and loyalty to the government he will swear to support. Defendants interpret this command as directing them "to test whether applicants for admission can truly subscribe to the 'constitutional oath of office'"; they read "the form of the government of the United States" to mean exactly what comes within the oath of support, and "loyalty to such government" to mean ability to take the oath in good faith. This construction of the statute by the very agencies charged with its administration is commended by reason. Since those who authored Rule 9406 were quite as aware as we are that the First Amendment lies at the very heart of our "form of government," we should not lightly suppose they had any idea that applicants should be refused admission to the bar for exercising their constitutionally guaranteed rights to freedom of speech, peaceable assembly and petition for redress of grievances. Since they were likewise entirely aware that the Constitution contains Article V, providing for amendment, we will similarly not suppose they intended admission to be refused to applicants who advocate amendment, even very radical amendment, by lawful means. Accepting defendants' construction, as we do, we could hold Rule 9406 to be invalid on its face only if the Constitution makes it impermissible to give any scrutiny to whether an applicant can honestly take a lawfully required oath.

We do not read Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), as prohibiting all inquiry to that end. The Court there recognized that the state need not seat a legislator who "swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath." 385 U.S. at 132, 87 S.Ct. at 347. If the state may consider declarations or manifestations made contemporaneously with the taking of the oath, by the same token it may make a reasonable inquiry whether

the oath taker is not in fact engaging in a solemn farce. The holding was rather that the information gathered by the special committee of the Georgia legislature had no sufficient tendency to negate Mr. Bond's position that he could conscientiously take the oath.

We therefore hold that Rule 9406 is not unconstitutional if implemented in accordance with its purpose. Before we proceed to plaintiffs' contentions concerning the questionnaires for its application prescribed by the Committees on Character and Fitness for the First and Second Departments, we must consider whether that subject is appropriate for adjudication by a court of three judges, 28 U.S.C. § 2281, or should be remitted to a single district judge.

### IV.

The relevant statute, 28 U.S.C. § 2281, instructs, in "deceptively simple" terms, see Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 114 (2 Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966):

> An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

The defendants apparently concede that a court of three judges would be required if the character committees of all four judicial departments had prescribed the same questionnaire, or even if they had prescribed different ones but all were here attacked on similar grounds. The concession is well made since, apart from other possible bases for applicability of the statute, the attack would be upon "an order made by an administra-

tive board or commission acting under [State] statutes," cf. Lathrop v. Donohue, 367 U.S. 820, 824–827, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (court order integrating state bar a "statute" within 28 U.S.C. § 1257), and it has long been settled that the ineptness of the 1913 amendment, 37 Stat. 1013, which added the reference to administrative orders but neglected to alter correspondingly the words "upon the ground of the unconstitutionality of such statute" should be overlooked. Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659 (1923). But defendants contend that since the questionnaires under attack cover only two of the four departments, the case comes within the judge-made exception to § 2281 excluding controversies not of state-wide importance. See Ex parte Collins, 277 U.S. 565, 567–569, 48 S.Ct. 585, 72 L.Ed. 990 (1928); Ex parte Public Nat'l Bank, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928); Wilentz v. Sovereign Camp, 306 U.S. 573, 59 S.Ct. 709, 83 L.Ed. 994 (1939); Rorick v. Board of Com'rs, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242 (1939); Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Hatfield v. Bailleaux, 290 F.2d 632 (9 Cir. 1961); D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 31–34, 55 (1964); D. Currie, Federal Courts 535–37 (1968).

We disagree for several reasons, any one of which would suffice:

The first ground lies in the difference between an attack on the order of an administrator as such and on the statute as applied by him. The distinction admittedly is elusive since, on the one hand, as said in Phillips v. United States, 312 U.S. 246, 252, 61 S.Ct. 480, 484, 85 L.Ed. 800 (1941), "some constitutional or statutory provision is the ultimate source of all actions by state officials," and, on the other, no statute is self-enforcing. Whatever the difficulties of articulation, there is still a perceptible difference between a challenge to a governor's "single, unique exercise" of power, 312 U.S. at

253, 61 S.Ct. at 484, under a statute of unquestioned validity empowering him generally to call out the national guard in case of war or "any forcible obstructing of the execution of the laws or reasonable apprehension thereof, and at all other times he may deem necessary," and the continuing administrative implementation of a statute, itself under attack, which is constitutional if applied in one way and not if in another. To put the point in a slightly different way, if the administrator is interpreting legislative policy, even a local application requires three judges; if he is making policy under a delegation, his local action can be tested by a single judge. See for further discussion Sardino v. Federal Reserve Bank, *supra*, 361 F.2d at 115; D. Currie, *supra*, 32 U.Chi.L.Rev. at 37–55; D. Currie, Federal Courts 534–35 (1968).

The second ground is that the actions of the two character committees under authority of the appellate divisions are not truly "local" within the teaching of the cases we have cited. It is true that the regulations of the committee in each department bear directly only on applicants who, being residents there, are seeking admission through the process established for them. But the effect of admission or denial is state-wide; admission in one department is the key to lawful practice throughout the State.

Thirdly, even if the questionnaires should properly be regarded as local administrative action, we would nevertheless retain jurisdiction as a three-judge court. The Supreme Court, in Louisville & N. R. R. v. Garrett, 231 U.S. 298, 303–304, 34 S.Ct. 48, 58 L.Ed. 229 (1913), expressly upheld the jurisdiction of the three-judge panel over nonconstitutional questions affecting the validity of the orders also attacked on constitutional grounds. In Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80–81, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960), the Court restated the *Garrett* holding in an approving dictum, while deciding that the joinder of a nonconstitutional claim did not obviate the need for three judges on the constitutional one

itself. Although both *Garrett* and *Lime Growers* concerned nonconstitutional attacks upon the same statute or order whose constitutional challenge required three judges, the same reasoning should apply when one attack is on the statute and the other on an order issued thereunder. In either case the overlap of evidence and argument is likely to be considerable. The policy of efficient use of judicial effort was pushed much further than this in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), where there was an encroachment upon state interests in determining issues not independently within federal cognizance. Since some issues raised by the complaints plainly call for three judges, there is not the compelling argument for judicial economy that exists when dissolution of the panel at the outset would save the energies of the two judges relieved from further duty. Furthermore to consign the questionnaires to a single judge would entail the prospect of separate appeals, one to the Supreme Court and the other to the Court of Appeals.

In Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Supreme Court entertained an appeal from three judges in a case we cannot distinguish from our own. The calling of three judges was there upheld because the plaintiff attacked the passport statute on the ground of unconstitutional delegation; the court below and the Supreme Court both considered, in addition, the contention that the Secretary of State's regulations under that statute were invalid. Perceiving the situation before it as no different from where the additional claim is a nonconstitutional attack on the same statute, the Supreme Court quoted from *Lime Growers* to establish that joining claims not themselves within the three-judge statutes does not dispense with the need for three judges for the consideration of all. See also Kurland, The Romero Case and Some Problems of Federal Jurisdiction, 73 Harv.L.Rev. 817, 838–45 (1960).

Finally, even if all the foregoing grounds should be wrong, and of course we do not think they are, we would nevertheless, in the exercise of discretion, continue to act together as regards the questionnaires. "Although a single district judge is without power to act in a case requiring three judges, the opposite is not true." Swift & Co. v. Wickham, 230 F.Supp. 398, 410 (S.D. N.Y.1964), appeal dismissed *for want of jurisdiction,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), aff'd, 364 F.2d 241 (2 Cir. 1966), cert. denied 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967). When the three-judge court has heard the entire case and lack of jurisdiction over one issue is at best debatable, sound policy calls for the three judges to decide that also, since a return of the issue to a single judge "would result in an invalid order if the return was erroneous, whereas the only consequence of erroneous retention of jurisdiction by the three-judge court is that the appeal should be taken to the Court of Appeals rather than to the Supreme Court, an uncertainty against which the plaintiffs may protect themselves by timely appeals to both courts." *Id.*

## V.

The questionnaires in use in the two departments have been the subject of recent changes which demonstrate that the Committees on Character and Fitness and the Justices of the Appellate Divisions are well aware of the need to bring them in line with developing concepts of First Amendment rights. The complaint in 68 Civ. 2938 attacked questionnaires issued to plaintiffs Wexler and Kaimowitz early in 1968 but these had been altered by the two departments in May be-

fore the actions were brought. After the commencement of the actions the appellate divisions deleted questions, set forth in the margin,[6] which would have raised exceedingly serious problems under Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). See also Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968).

The questions to which most strenuous objection is made are the following:

26. Have you ever organized or helped to organize or become a member of or participated in any way whatsoever in the activities of any organization or group of persons which teaches (or taught) or advocates (or advocated) that the Government of the United States or any State or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means? _____ If your answer is in the affirmative, state the facts below.

27(a) Do you believe in the principles underlying the form of government of the United States of America? _____

(b) Can you conscientiously, and do you, affirm that you are, without any mental reservation, loyal to and ready to support the Constitution of the United States? _____

Taking these in reverse order, we fail to see what valid objection can be made to question 27(b). This differs from the New York Constitutional oath sustained in Knight v. Board of Regents, *supra,* 269 F.Supp. 339, aff'd, 390 U.S. 36, 88 S.Ct. 816, 19 L.Ed.2d 812, only in the inclusion of two additional phrases, "without any mental reservation" and a declaration of loyalty. The former phrase is included in the oaths all of us have taken as judges, and we cannot per-

---

6. "28(a) Have you participated in activities of a public or patriotic nature or in philanthropic, religious, or social service? _____ If so, state fully.
"(b) If you engaged in extracurricular activities (athletic, dramatic, debating, club, committee, administration, etc.) in college, indicate approximate amount of time spent and responsibility involved.

"29(a) Give the names, addresses, objects and period of membership in each and every club, association, society or organization of which you are or have been a member other than those associated with and recognized by accredited schools and colleges."

ceive any proper reason why any applicant for admission to the bar should cavil over it. We likewise find it impossible to see why requiring a future lawyer to declare his loyalty to the Constitution should be deemed objectionable when a promise to support it is not.[7] The suggestion that a prospective lawyer would fear that a declaration of loyalty to the Constitution would prevent his criticizing acts of the Government does not require discussion.

 Question 27(a) is alleged to be impermissibly vague. It is claimed, for example, that an applicant might think he could not respond in the affirmative if he did not believe in the electoral college or a bicameral legislature. There is enough substance to this objection that we think the question should be eliminated or altered. The phrase "principles underlying the form of government," as distinguished from the simpler phrase used by Rule 9406 in addressing the appellate divisions and the committees, might be understood by an applicant to include many "principles" of a lower order than the essentials, democratic government and change by lawful methods. One who favored drastic reforms, albeit through constitutional means, might perhaps feel unable conscientiously to answer with a simple "yes;" yet the format of the question affords no additional space for explanation and the word "principles" is so vague as to create a problem even if opportunity for explanation were afforded. The question thus may share the defect of the oath in Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967), which the Supreme Court found capable of being read to require the affiant to disclaim any desire to "alter" the government by peaceful "revolution." It seems unnecessary to require such an imprecise declaration from an applicant for admission to the bar. Defendants say the question is intended merely to be "subsidiary to and supportive of" the constitutional

oath; while we have held that the state can permissibly make some inquiry into the applicant's ability sincerely to take the oath, this purpose can be served by more circumscribed questions, such as 27(b) and the various factual questions contained throughout the questionnaires. Question 27(a) should thus be deleted or rephrased to remove the imprecision we have noted.

Question 26 also raises a difficult problem. Plaintiffs rely on cases such as *Baggett, Elfbrandt,* and *Keyishian,* cited in section III of this opinion, and also on Shelton v. Tucker, *supra,* 364 U.S. 479, 81 S.Ct. 247, and Schneider v. Smith, *supra,* 390 U.S. 17, 88 S.Ct. 682. Defendants distinguish the former as involving statutes that set up a bar to employment or decreed a termination of it, all in the field of teaching where the First Amendment dictates "particular concern for the safeguarding of academic freedom," Haskett v. Washington, *supra,* as contrasted to the mere inquiry here. They distinguish *Shelton* and *Schneider* upon the breadth of the questions asked. Defendants assert in the first instance that the principle remains sound that in order to protect "some interest clearly within the sphere of governmental concern" a state may "deny positions to persons supposed to be dangerous because the position might be used to the detriment of the public." Speiser v. Randall, *supra,* 357 U.S. at 527, 78 S.Ct. at 1343. In Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1961), for example, the Court sustained a requirement that a candidate for public office swear that he was not engaged " 'in one way or another in the attempt to overthrow the government *by force or violence,*' and that he is not knowingly a member of an organization engaged in such an attempt." Further, although what is within the state's power of exclusion is necessarily within its power of inquiry, defendants argue that the latter is broader since the state is entitled to

---

7. See also the oath which the Constitution requires of the President to "pre-

serve, protect and defend" it. Art. II, § 1.

information from which it may develop that a person has in fact engaged in conduct justifying a bar to office that he has not been willing to admit. With respect to the scope of inquiry, Question 26 does not approach the requirement struck down in *Shelton* that every associational tie be disclosed, a requirement the Court held to be too indiscriminate in its sweep. The decisions in Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1444 (1958); Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423 (1958); Nelson v. County of Los Angeles, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960); Konigsberg v. State Bar of California, *supra*, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 and In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961), demonstrate that the Constitution does not prohibit a state from *asking* a public official or a candidate for admission to the bar whether he was ever a member of the Communist Party or, as in the *Nelson* case, of other organizations known to the member to advocate violent overthrow of the government.

The most obvious problems with Question 26 are the parenthetical past-tense verbs. While the draftsman probably intended these to relate to the period of the applicant's membership, this is not made clear; the question could be read as requiring an applicant to report membership in an organization that advocated overthrow of the Government of the United States in 1860 but now would defend every syllable of the Constitution. The question should be corrected to clarify that the organization's teaching or advocacy of violent overthrow must have coincided in time with applicant's membership—a correction to which we cannot conceive the defendants would object. The next issue is whether the question must be further limited to cases where the applicant knew of the teaching or advocacy. Defendants do not assert they could constitutionally exclude applicants unless this was shown; their contention is rather, as noted above, that they should be permitted to frame their inquiry more broadly, that an applicant making an affirmative answer will be free to qualify this, and that the committees and the appellate divisions will then be in a position to determine the truth of the disclaimers. While there is force in this, no Supreme Court decision has gone beyond sustaining inquiry into membership in organizations known to the member to advocate forceful or violent overthrow, or in the Communist Party whose advocacy is evidently deemed a matter of common knowledge. We are not disposed to sanction inquiries of greater scope. Although Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), could be distinguished as involving a sweeping legislative inquiry not limited to public employees or applicants for admission to the bar, it indicates the Court's aversion to questions concerning associations in the absence of *scienter*. The prospect of having to respond to an inquiry like Question 26 might have a deterring effect on exercise of the constitutionally protected right of association, and this can be justified only when "the subordinating interest of the State" is "compelling," Sweezy v. New Hampshire, *supra*, 354 U.S. at 265, 77 S.Ct. at 1219 (concurring opinion of Frankfurter, J.)—a test applied in Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) and NAACP v. Button, 371 U.S. 415, 439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The state's interest in informing itself of the prior associations of candidates for the bar with subversive organizations can be adequately protected by a question more narrowly phrased. See Nelson v. County of Los Angeles, *supra*, 362 U.S. at 2–3 & n. 1, 80 S.Ct. 527.

■ Plaintiffs also attack Question 31. In the First Department this reads:

Is there any incident in your life not called for by the foregoing questions which has any favorable or detrimental bearing on your character or fitness? ——— If the answer is "Yes" state the facts.

In the Second Department the words "favorable or" are omitted. Plaintiffs contend that this catch-all has a serious *in terrorem* effect, especially in light of the directions at the head of the application:

1. This is a statement made under oath. Applicant's failure fully and accurately to disclose any fact or information called for by any question may result in the denial of the application for admission, or if applicant shall have been admitted before the discovery thereof, *in the revocation of his license to practice law*.

We agree. The committees and the appellate divisions should be able to frame specific questions adequate to elicit the information they need; indeed they have demonstrated in the 31 other questions what plaintiffs consider an excessive ability in that regard. We find no interest of the state sufficiently compelling to require an applicant to engage in the soul-searching of his entire past life demanded by Question 31.[8]

■■■ We take a different view with respect to the last question requiring discussion in the text of this opinion:

32. (a) Have you read the Canons of Ethics adopted by the American and New York State Bar Associations? ———

(b) Will you conscientiously endeavor to conform your professional conduct to them? ———

The objection is to (b); plaintiffs contend that an applicant may conscientiously disagree with various Canons, which currently are being revised, and still deserve admission to the bar. We agree with that position but not with the conclusion plaintiffs draw from it. There is no vagueness here of the sort we found in Question 27(a); an applicant who has read the Canons knows just what standards he is being asked about. If he dissents from a particular Canon, he need only say so and explain why. We have been cited no evidence that such dissent on a reasoned basis would bar admission.

Finally, plaintiffs attack generally the practice of the committees of conducting individual personal interviews with applicants, at which, among other things, questions are posed "on the basis of the applicant's answers to the questionnaire." Plaintiffs allege that the scope of this questioning is sometimes so broad as to constitute an unwarranted invasion into the applicant's personal and political privacy. We do not understand plaintiffs to deny that a personal interview can be a permissible and very helpful aid to the committees in judging fitness for admission to the bar. Rather, their complaint goes to the scope of interviews conducted at a time when the questionnaires included inquiries since deleted or here disapproved by us. We have no reason to assume that as the scope of the committees' written inquiry is contracted, there will not be a similar adjustment in the focus of their spoken questions.[9]

---

8. At the argument before us, David W. Peck, Esq., former Presiding Justice of the Appellate Division for the First Department, who appeared as counsel for the character committees, while contending Question 31 to be innocuous, expressed personal dislike for it and the opinion that there would not "be any great to-do about question 31."

9. Plaintiffs also challenge Questions 19–22, which call for information concerning the applicant's registration for Selective Service, rejection for and discharge from military service, and charges or complaints during military service. We do not understand plaintiffs to deny that all these are matters of public record, which, however, the committees could obtain only at great trouble and expense. It is not unreasonable for them to save this expense by drawing upon the applicant's personal knowledge. In reply briefs plaintiffs complain of a requirement, allegedly made by the Committee on Character and Fitness of the Second Department, that an applicant authorize the Clerk of his Local Board to allow members and staff of the Committee and the Appellate Division to have unrestricted access to his entire file. Although we would entertain considerable doubt about the propriety of this, we have not passed upon it since it was not alleged in the complaints or affidavits.

The complaints do raise question about the committees' requirement that appli-

## VI.

 We must now consider the appropriate disposition in light of the foregoing discussion. While we have power to issue an injunction against use of the questionnaires until Questions 26, 27(a) and 31 are omitted or rephrased and against resumption of use of the questions that have been discontinued, see, e. g., fn. 6, we find no immediate occasion for doing so. Although "the court's power to grant injunctive relief survives discontinuance of the illegal conduct," United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L. Ed. 1303 (1953), a court is not required to award it, as that case demonstrates. Counsel for the character committees emphasized at the argument that "these State Courts are not stiff-necked about this thing." Considerations of comity to respected fellow-judges suggest they should be afforded a reasonable opportunity to reflect on our conclusions and perhaps take action that may obviate any occasion for an injunction. Law students will not suffer any serious chill during this brief interval, when the ultimate result is so clear. We believe also that if the three plaintiffs who have passed the examinations and have refused to fill out the questionnaires should decline to answer Questions 27(a) and 31 and answer Question 26 only as limited to membership in organizations known to them to be then teaching or advocating overthrow of the Government by force or violence, they would not find obstacles in their way; if our expectation should

prove unfounded, they may apply to us for relief.

We shall therefore hold all motions until such date, not later than ninety days from the entry of this opinion, when counsel for the defendants shall report in writing what action, if any, the appellate divisions have taken. Such report shall be served upon plaintiffs' counsel; within twenty days thereafter, they may, if so advised, serve and file appropriate papers with respect to what further relief, if any, they deem required; the defendants shall answer within fifteen days. If counsel desire an opportunity for further argument, we will assign a date.

It is so ordered.

MOTLEY, District Judge (concurring in part, dissenting in part).

In these consolidated cases plaintiffs challenge, on First and Fourteenth Amendment grounds, certain New York statutes which contain the criteria for determining eligibility for admission to the bar.[1] One of these statutes provides that an applicant shall be admitted if the admitting court is satisfied that he "possesses the character and general fitness requisite for an attorney and counselor-at-law." New York Judiciary Law, § 90. The second statute provides that the applicant shall be admitted if, in addition, he has "furnished satisfactory proof to the effect that he believes in the form of government of the United States and is loyal to such government." New York Civil Practice Law and Rules,

---

cants obtain and submit affidavits from third persons attesting to their good moral character. The forms of these affidavits have recently undergone radical curtailment. The First Department's current form says nothing about home visits by the affiant, and the Second Department's does not require the affiant to aver that he has visited the applicant's home but merely to say whether or not he has. While the latter provision is asserted to be an invasion of the applicant's personal privacy forbidden by Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965),

and Camaro v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), those cases are so remote from the issue as not to warrant discussion.

1. The New York statutory and regulatory provisions and procedures governing admission to the bar are similar to those in most other states. See generally Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) and Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957).

Rule 9406. These statutes are attacked on the ground that they are unconstitutionally vague and broad, resulting in a chilling effect upon the exercise of First Amendment freedoms by law students and those awaiting admission to the bar after having passed the written examination required. This judge, applying the concepts of vagueness and broadness holds: 1) the first statute is constitutional, but its interpretation, implementation and application by the defendant courts and their respective character committees is unconstitutional; and 2) the second statute is unconstitutional on its face and as interpreted, implemented and applied by defendants.

There is a rule of the New York Court of Appeals which implements the first statute by providing that every applicant must produce before the character committee and file with it "evidence that he possesses the *good moral character* and general fitness requisite for" an attorney.[2] [Emphasis Added]. This must be shown by the affidavits of two reputable persons residing in the city or county in which the applicant resides, one of whom must be a practising attorney.[3] According to the rule, the affidavits "must state that the applicant is, to the knowledge of the affiant, a person of *good moral character* and must set forth in detail the facts upon which such knowledge is based."[4] [Emphasis Added]. The term "good moral character" is not defined. The rule further provides that such "affidavits *shall not be conclusive,* and the [admitting court] may make further examination and inquiry through its Committee on Character and Fitness or otherwise."[5] [Emphasis Added]. Finally, the rule provides that the admitting courts, which are the four appellate divisions of the New York Supreme Court, shall adopt such additional rules as they may deem fit with respect to the requirement that the applicant prove his good moral character and general fitness.[6]

## I. *Statement of the Facts*

In order to recognize the full dimensions of the constitutional issues posed here, it is necessary to examine closely the manner in which the foregoing statutes and rules were interpreted, implemented and applied by the appellate divisions which are defendants here and their respective character committees. To implement the Court of Appeals rule, defendants prepared instructions for persons furnishing affidavits and the affidavit forms, copies of which are attached to the original and amended complaints in the second action. The First Department's instructions advised affiants that their affidavits must "state that to the knowledge (or in the opinion) of the affiant the applicant is a person of good moral character", and must set forth "in detail the facts upon which affiant's knowledge of or opinion as to applicant's moral character is based." There is no definition of "good moral character" and the language of the statute, "character and general fitness requisite for an attorney and counsellor-at-law", is not used. The instructions additionally advised: "Affidavits covering home life should characterize family and home environment." There is no further amplification of this instruction. The Second Department combined its instructions with the affidavit form and entitled it: "Form for Affidavit of Character and Home Life." The affidavit form contained a series of questions to be answered by the affiants. These questions demonstrate the unconstitutionally vague and broad manner in which the

2. New York Judiciary Law, Appendix, Rule VIII–1, Rules of the New York Court of Appeals for Admission of Attorneys.

3. *Id.*

4. *Id.* Rule VIII–2.

5. *Id.*

6. *Id.* Rule VIII–4. This rule reads: "The justices of the Appellate Division in each department shall adopt for their respective departments such additional rules for ascertaining the moral and general fitness of applicants as to such justices may seem proper."

first statute, Judiciary Law § 90, and the Court of Appeals Rule VIII was interpreted, implemented and applied by defendants. The exemplars are as follows:

7. Describe briefly your associations with the applicant, setting forth how such associations began, and indicate in what activities (business, scholastic, cultural, recreational, athletic, social or otherwise) you have participated with applicant. It is not a sufficient answer merely to repeat the above words in parentheses, but the *particular activities* should be specified.

9. What is your conclusion as to applicant's *moral* character? (Reserve details for next question)

10. Set forth in detail what you have *personally observed* in your associations with applicant which leads you to the conclusion set forth under question 9, specifying, among other things, the moral qualities and personal traits observed in applicant's conduct, and his usual attitude toward those with whom he associates.

11. Have you visited applicant's

(a) parental home;

(b) marital home, if any;

(c) any other home or place of abode applicant may have had

(answer "Yes" or "No" to each subdivision).

12. (a) How often, approximately, during each week, month or year, have you visited the parental, marital or other home or place of abode of applicant?

("Frequently" or "often" or other indefinite statement is not a satisfactory answer. Note that in most cases visits will be less frequent than the contacts mentioned in Q. 8, above).

(b) During what years (stating approximate dates)?

(c) At what addresses (listing them specifically)?

(d) Do such visits still continue? If not, when did they cease, and for what reason?

13. Have you on such visits met and conversed with:

(a) Applicant;

(b) The members of his family or household? If not with all, with which members?

14. (a) With what persons has the applicant lived during each period of your association with him in his home?

(If during period or periods covered by answer, applicant has lived with family, enumerate the members of the family during each period. If, during any period of association, he has lived apart from his family, enumerate the persons, if any, with whom he has lived during each such period.)

(b) With what persons does he live at the present time, if that be known to you?

15. Set forth in detail what you have *personally observed* as to the moral qualities and conduct of the members of applicant's family or other persons with whom he has lived:

(a) in parental home;

(b) in marital home, if any;

(c) in any other home or place of abode applicant may have had.

16. What do you say of applicant's conduct towards the members of his family or household during each period of your association with him in his home, and at present, if association still continues? (Give full details).

17. State fully any other facts within your knowledge, *or of which you have information,* which in your opinion have any bearing on the applicant's moral character or fitness to practise law, or which would be helpful to the Committee in determining the applicant's character and fitness. [Emphasis Added].

After these actions were filed, these affidavit forms and the instructions were changed. The First Department's form was greatly shortened and has omitted the instructions regarding affidavits covering home life but asks the affiant to state:

"6. Length and nature of affiant's acquaintance with applicant:

(a) Residence of applicant;

(b) Persons with whom applicant lives (if known to affiant).

7. Affiant's conclusions as to applicant's moral character:

8. Facts upon which affiant's knowledge or opinion as to applicant's moral character is based.

Again, the term "moral character" is not defined and the statutory language is not incorporated.

The Second Department has changed the title of its form to read: "Form for Affidavit of Character and Residence." It has omitted some of the above questions but still requests the following information:

"5. Describe briefly your associations with the applicant, setting forth how such associations began, and indicate in what activities (business, scholastic, cultural, recreational, athletic, social or otherwise) you have participated with applicant. It is not a sufficient answer merely to repeat the above words in parentheses, but the particular activities should be specified.

7. What is your conclusion as to applicant's moral character? (Reserve details for next question).

8. State in detail the facts upon which your knowledge or opinion as to applicant's character is based.

9. Have you visited applicant's

(a) parental home;

(b) marital home, if any;

(c) any other home or place of abode applicant may have had?

10. How often have you visited the parental, marital or other home or place of abode of applicant?

("Frequently" or "often" or other indefinite statement is not a satisfactory answer. Note that in most cases visits will be less frequent than the contacts mentioned in Q. 6, above).

Missing from this form, again, is any definition of the terms "moral character" and the statutory language is not referred to therein.

In addition to the character affidavits, each judicial department, as authorized, has appointed a committee for the purpose of making an investigation.[7] Each committee is known as the Committee on Character and Fitness of the particular department. To enable the committee to make its investigation, another statute authorizes the committee, subject to the approval of the justices of the appellate division, "to prescribe and from time to time amend a form of statement or questionnaire on which the applicant shall set forth all the information and data required by the Committee and the appellate division justices."[8] Two other statutes must be noted at this juncture. One provides that, "[u]nless otherwise ordered by the appellate division, no person shall be admitted to practice without a certificate from the proper committee that it has carefully investigated the character and fitness of the applicant and that, in such respects, he is entitled to admission."[9] The other statute is the second statute referred to initially which provides that, "[n]o person shall receive said certificate from any committee and no person shall be admitted to practice as an attorney * * *, unless he shall furnish satisfactory proof to the effect * * * that he believes in the form of the government of the United States and is loyal to such government."[10]

7. New York Civil Practice Law and Rules, Rule 9401.

8. *Id.* Rule 9404.

9. *Id.*

10. *Id.* Rule 9406.

In accordance with the foregoing statutory mandates, defendants have prepared application forms. These forms, known as the "Questionnaire and Statement", presently contain 32 questions, all of which must be answered unless otherwise indicated. In addition, "every question and every part of each question must be answered, even though the answer be negative." The application form admonishes the applicant: "This is a statement made under oath." The applicant is further warned that, "failure fully and accurately to disclose any fact or information called for by any question may result in the denial of the application for admission, or if applicant shall have been admitted before the discovery thereof, in the revocation of his license to practise law."

There are two application forms involved in these actions; one form is that used by the Committee on Character and Fitness of the First Department and the other by the Second Department's Committee. When the complaints in these actions were filed, these forms, unknown to plaintiffs, had just been amended in May 1968. Some of the questions objected to in the original complaints had been either deleted or changed. In June 1968, just prior to the filing of these suits, the First Department had already begun to distribute its amended form. After these actions were filed, the Second Department began to distribute its amended form to applicants. After the filing of these complaints, still other questions originally objected to were deleted from the amended forms.[11] The net effect of these changes and deletions, however, is to leave unchanged the First and Fourteenth Amendment challenge to the statutes. "The substance of the statutory and regulatory complex remains and from the outset * * * [plaintiffs'] basic claim has been that they are aggrieved by its application." Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589, 596, 87 S.Ct. 675, 680, 17 L.Ed.2d 629 (1967).

See also, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

In the original forms, questions 19, 20 and 21 of the First Department's form and questions 32 and 36 of the other were specifically objected to on First and Fourteenth Amendment grounds. Once again, the full flavor of the constitutional assault cannot be appreciated without a close scrutiny of how the committees interpreted and set about their task of implementing and applying the two basic statutes containing the criteria for admission to the bar. The following questions attest the "danger of tolerating, in the area of First Amendment freedoms, the existence of a * * * [regulatory] statute [i. e. C.P.L.R. 9406] susceptible of sweeping and improper application" NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963); Dombrowski v. Pfister, supra:

*First Department*

19. (A) Are there any favorable or unfavorable incidents in your life, whether at school, college, law school, business or otherwise, not called for by the questions contained in this questionnaire or disclosed in your answers thereto?

If so, list them.

20. Have you participated in activities of a public or patriotic nature or in philanthropic, religious, or social services?

*If so, state fully.*

21. (A) Give the names, addresses, objects of and period of membership in each and every club, association, society or organization of which you are or have been a member.

*Second Department*

32. Have you written any articles for publication?

If so, give the circumstances, the name of publication, the date of publication and the title and subject matter of the article. (Include information relative to any articles

---

11. The first action was filed July 16, 1968 and the second action the next day.

for publication in any school or college paper or magazine.)

36. (A) Are you now, or have you ever been at any time (including the time during which you attended high school, college and law school, and including the time during which you engaged in military service or any community activity) a member of any club, association, society or organization or *political party?* [Emphasis Added].

(B) If answer be yes, give the name, address and objects of each and every such club, association, society or organization or party and state the period of your membership and your position or title therein.

Questions 22 and 23 of the First Department's form and question 35 of the other were also objected to by plaintiffs. These questions read:

*First Department*

22. (A) Are you now or have you ever been a member of *or affiliated in any way* with any of the organizations or groups listed as subversive by the Attorney General of the United States? [Emphasis Added].

(B) Have you paid dues to, contributed in any way or signed a petition for any such organization or group?

If your answer is yes to either subdivision of this question, give the following information:

Name and address of organization or group * * *

When you became a member or affiliated with it * * *

Period of your association or connection with it * * *

How and why you became associated or connected with it * * *

How and why you severed your connection with it, if you did * *

23. Have you ever participated *in any way whatsoever* in the activities of such organizations or groups? [Emphasis added].

If so, to what extent.

*Second Department*

35. (a) Are you pledged now or have you ever been pledged to aid in effecting changes in our form of government by force or violence or any other unlawful means?

(b) Are you now or have you ever been a member of any party or organization created for such purpose or for the propagandizing or the furtherance thereof?

(c) If answer is yes, state the name of the party or organization.

(d) Are you now, or have you ever been, a member of the Communist Party, or have you ever been enrolled as a member of the Communist Party?

The oaths prescribed by question 24 of the First Department's form and questions 33 and 34 of the other were objected to also. The First Department's question, which was virtually identical with the Second Department's question read:

24. (A) Do you believe in the principles underlying the form of government of the United States? * * State on a rider, in not less than 100 words, what you believe those principles to be. (Handwritten)

(B) Can you conscientiously and do you affirm that you are, without any mental reservation, loyal to the Government of the United States? * *

The June 1968 amended forms deleted the following questions, *supra:* 19B, 20, 21(a) (First Department) and 32 and 36 (Second Department). The amended forms revised the remaining First Department questions as follows:

Question 19(A) was revised to read:

"31. Is there any incident in your life not called for by the foregoing questions which has any favorable or detrimental bearing on your character or fitness? If the answer is "Yes" state the facts.

No time limit is specified as to this question.

Question 21(B) was revised to read:

"29. (b) Have you ever been disciplined, expelled, suspended, or ordered to resign from any club, association, society or organization? If your answer is "Yes", state the facts.

Again, no time limitation is given.

Questions 22(A) and (B) and 23 were revised to read:

"26. Have you ever organized or helped to organize or become a member of *or participated in any way whatsoever* in the activities of any organization or group of persons which teaches (or taught) or advocates (or advocated) that the Government of the United States or any State or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means?

If your answer is in the affirmative, state the facts below. [Emphasis Added].

Questions 24(A) and (B) were revised to read:

"27. (a) Do you believe in the principles underlying the form of government of the United States of America?

(b) Can you conscientiously, and do you, affirm that you are, without any mental reservation, loyal to *and ready to support the Constitution of the United States?* [Emphasis Added].

The amended forms revised the remaining Second Department questions as follows: Questions 33 and 34 (principles underlying form of government and loyalty) were revised to read as the First Department's question 27, immediately *supra*, and question 35 (pledged to aid change in form of government) was revised to read as the First Department's question 26, *supra*, immediately preceding question 27.

After the suits were commenced and after the June 1968 amended forms had been distributed, in a tacit confession of error, defendants advised the court that the following questions had been deleted from both amended forms:

28. (a) Have you participated in activities of a public or patriotic nature or in philanthropic, religious, or social services?

If so, state fully.

(b) If you engaged in extracurricular activities (athletic, dramatic, debating, club, committee, administration, etc.) in college indicate approximate amount of time spent and responsibility involved.

29. (a) Give the names, addresses, objects of and period of membership in each and every club, association, society or organization of which you are or have been a member other than those associated with and recognized by accredited schools and colleges.

In addition to the affidavits of good moral character and complete answers to questions in the Questionnaire and Statement, applicants, as a matter of practice, must appear for a personal interview before a member of the Committee on Character and Fitness. During the course of these interviews, applicants, as authorized by Court of Appeals Rule VIII–2, are questioned further about their "good moral character and general fitness", based upon the affidavits and answers on the Questionnaire and Statement. Plaintiffs alleged that these interviews often involve inquiry into the applicant's political activities, speeches, beliefs and conduct of a personal and private nature. Only a general denial of these allegations has been made in the answers filed by defendants and no other denial of the validity of these allegations has been presented.

It also is essential to a full understanding of the constitutional claims made here to know who it is who challenges these statutes and why such challenge is made. In this connection we must know who the plaintiffs are and why they are here.

Plaintiffs in the first case are the Law Students Civil Rights Research Council,

Inc. and three law students. The organizational plaintiff is a non-profit membership corporation organized under the laws of the District of Columbia with principal offices in New York City. Its principal objectives are: 1) "non-partisan research, study and analysis of the law with a view to eliminate prejudice and discrimination; to defend human and civil rights secured by law; and to make public the conclusions reached through such research"; and 2) to "provide a civil rights program where students may study with and assist members of the legal profession in the civil rights field on behalf of indigent, poor and distressed, or underprivileged litigants on civil rights cases." [12] The membership of the Council consists of law students, approximately 1500, in 60 law schools throughout the country. There are chapters of the organization in the City of New York at the law schools of Brooklyn College, Columbia, Fordham, and New York Universities. Membership in these chapters includes persons who are residents of either the First or Second Judicial Department and who have either applied for or intend to apply for membership in the New York Bar in those departments. The Council sues on behalf of these members. The complaint alleges that the work of the organization can succeed only if law students may freely engage in the organization's activities, uninhibited by the fear of subsequent delay in or denial of admission to practice because of prior involvement with the organization or its activities. The individual plaintiffs are all law students who plan to apply for admission to the New York State Bar upon graduation from law school.

Plaintiffs in the companion case are three individuals who have taken and passed the written examination required of all applicants for admission to the New York bar and two organizational plaintiffs. Two of the individual plaintiffs reside in the First Judicial Department and one resides in the Second Judicial Department. Two of these individuals have never been arrested and have never been suspended or dismissed from any school or university. One has never been suspended or dismissed from any school or university, but he has been arrested for distributing handbills in Albany, Georgia in the summer of 1963. Two of the plaintiffs are graduates of New York University Law School and one is a graduate of the Columbia University School of Law. One is presently an assistant professor of law at Columbia. Another plaintiff is a member of the staff of the Columbia University Center on Social Welfare Policy and Law. One has a master's degree in law.

The Columbia Law Students Guild, one of the organizational plaintiffs, includes law students attending Columbia University School of Law who have not yet graduated from law school and who have not yet taken steps to gain admission to the bar other than their pursuit of the required law studies. These students intend to apply for admission to the bar upon completing law school. The organization also includes students who have completed law school and who have applied for admission to the bar. The other organizational plaintiff includes in its membership law students from the various law schools in New York City. It is a chapter of the National Lawyers Guild. Both organizational plaintiffs are non-profit organizations devoted in the main to the promotion of law reform, facilitation of the administration of justice, and the protection and fostering of civil rights and liberties.

But, more specifically, as related to the issues raised in this case, the Law Students Guild actively seeks to involve its members in the work of civil rights, civil liberties, and poverty organizations. The National Lawyers Guild, with which both organizational plaintiffs are affiliated, adopted a resolution at its national convention in July 1968 "which places particular emphasis on the concern of lawyers with the war in Vietnam, the draft,

12. Second Amended Complaint, paragraph 3.

racism, and the crises of the poverty and the urban ghettos." [13] It is alleged in the complaint that the New York Chapter "seeks solution to these problems through a radical change in the structure of the nation's legal, political and economic system." [14] It is further alleged that in connection with these objectives, the members of the New York Chapter "have engaged and will engage in many activities not traditionally undertaken by other bar associations." [15] As in the first action, the complaint alleges that these organizations can succeed in their program objectives only if law students feel free to engage in such activities uninhibited by the fear of subsequent delay or denial of admission to practice because of affiliation with these organizations. Both of these organizations likewise sue on behalf of their members who have applied or who will be applying for admission to the bar.

All three organizational plaintiffs have the same standing to sue on behalf of their members as that found in the case on which they rely. N. A. A. C. P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). A close look at plaintiffs makes clear that they are not concerned here with whether a law student who has stolen money from his employer or who has murdered his mother may, nevertheless, be admitted to the bar.

They are plainly concerned with whether political tests may be employed in determining eligibility.

Plaintiffs have moved for summary judgment. Defendants have answered and have moved to dismiss. There is no genuine issue as to any material fact alleged in the complaint, including the questions used by the respective character committees prior to and at the time the suits were filed and the questionnaires as amended and revised since the institution of these actions. Plaintiffs are entitled to judgment as a matter of law and, consequently, to the injunction they seek. Clemons v. Board of Education of Hillsboro, 228 F.2d 853 (6th Cir. 1956), cert. den. 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868; Henry v. Greenville Airport Commission, 284 F.2d 631 (4th Cir. 1960); United States v. Beaty, 288 F.2d 653 (6th Cir. 1961); Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966).

## II. *The First Statute*

On the merits of the questions which the court finds dispositive of this case, plaintiffs must prevail.[16] If plaintiffs had brought these cases a decade or more ago, i. e., prior to the first Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957), it is doubtful they could have found sufficient precedent with which to convince a court

---

13. Amended Complaint paragraph 7b.

14. *Id.*

15. *Id.*

16. Plaintiffs also claim that: 1) the personal interview and character affidavits regarding home life which are required violate rights secured by the Fourth, Fifth, Ninth and Fourteenth Amendments; 2) the oaths required and disclosures compelled violate the Fifth and Fourteenth Amendments; 3) the statutes, rules, regulations and practices violate the Sixth and Fourteenth Amendments' guarantee of the right to the effective assistance of counsel and the independence of the bar; 4) the admission procedures do not comply with due process of law guaranteed by the Fourteenth Amendment in that they permit denial

or delay of admission to the bar without providing for notice of charges, a full hearing at which counsel may be present, an opportunity for confrontation and cross examination, and specification of findings. The latter claim was made, in the main, in Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963). Plaintiffs claim that defendants have not taken any action to comply with the *Willner* decision. That case held defendants' procedures lacking in due process since they failed to provide applicant with a hearing on the reasons for denial of his admission. Although defendants did not reply to this serious charge, it seems that a determination of this issue should await a case in which the procedural due process issue is clearly raised by the facts.

of the validity of their claims.[17] Today, however, a decade after Schware v. Board of Bar Examiners of State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) and the first *Konigsberg* case, in which the identical issues lurked, plaintiffs' briefs sparkle with the jewel-like precedents of the intervening years in clearly analogous contexts. Waving their First Amendment freedoms on high—especially freedom to believe what one will, freedom of association, and the right to privacy in one's home—plaintiffs carry the banner for lawyers to have the same protection against state infringement upon these areas as has been won for public employees (especially teachers), Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Keyishian v. Board of Regents, supra, Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); other licensed professions such as merchant seaman, Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L. Ed.2d 799 (1968); Negroes, NAACP v. Button, *supra,* Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Bates v. Little Rock, 361 U.S. 516, 80 S. Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, *supra;* other civil rights advocates, Dombrowski v. Pfister, *supra;* Communists, Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L. Ed.2d 992 (1964); veterans, Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L. Ed.2d 1460 (1958); and the population in general, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The first statute, attacked by plaintiffs on the grounds of vagueness and broadness, provides that an applicant who has passed the written examination should be admitted to the bar if the appellate division to which he has applied "shall be satisfied that such person possesses the character and general fitness requisite for an attorney and counselor at law."

In the second *Konigsberg* case, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961) the good moral character standard was again involved as it had been in the *Schware* case and the first *Konigsberg* case, *supra.* In none of these cases, however, was the "good moral character" standard, *per se,* drawn into question as it is here on the grounds of vagueness and broadness. And since that time, the concepts of vagueness and broadness have not yet been applied by the Supreme Court to this standard or any other bar admission standard as they have been applied recently to statutes and oaths required of persons seeking public licenses or employment or assuming public office. Schneider v. Smith, *supra;* Cramp v. Board of Public Instruction, *supra;* Baggett v. Bullitt, *supra;* Elfbrandt v. Russell, *supra;* Keyishian v. Board of Regents, *supra;* Whitehill v. Elkins, *supra.*

In the second *Konigsberg* case, *supra,* 366 U.S. at 40, 81 S.Ct. at 1001, Mr. Justice Harlan, writing for the majority, pointed out that the validity of the requirement that an applicant for admission to the bar bear the burden of proof of "good moral character" had not been drawn into question there. He also noted that the requirement could not "well be drawn in question", citing the fact that such a requirement exists in all the states. But there was drawn in question the right of the state to put upon an applicant the burden of proving that he had not advocated the overthrow of government by force and violence. In this connection, Mr. Justice Harlan pointed out that Konigsberg did not challenge the constitutionality of the California statute which forbade certification for admission to the bar of those who so advocated. The majority held, however, that the burden of proof on this issue

---

17. Note, Inquiries Into The Political Beliefs and Activities of Applicants For Admission To The Bar, 1 Colum. Survey of Hum. Rts. L. 33, 45 (1967–1968).

had not been put upon applicants but upon the state and that in this connection an applicant could not obstruct a committee's inquiry into lawful standards of admission by refusing to answer questions. Konigsberg had refused to answer the question whether he had been a member of the Communist Party on the ground that the First Amendment protected him in his refusal to answer, although he swore that he had never advocated the overthrow of government by force. The majority disagreed with Konigsberg's First Amendment claim. Using a balancing test, the majority held that "the State's interest in having lawyers who are devoted to the law in its broadest sense, including not only its substantive provisions, but also its procedures for orderly change, was clearly sufficient to outweigh the minimal effect upon free association" occasioned by the compulsory disclosure of political party membership in that case.

We, therefore, review here for the first time the moral character standard and the other bar admission standards involved here in the light of the vagueness and broadness concepts which the high Court has applied to other First Amendment cases since the second *Konigsberg* case, without reference to the obstruction rule or the balancing test used there.

The term "good moral character" has not been defined by the New York courts and counsel for defendants have not offered any definition. The term "general fitness" has been defined in only one case as follows: " * * * the words 'general fitness' have rather to do with a man's general experience in life, his family life, his associates, his business or other experience, his general reputation and the like." Application of Brennan, 230 App. Div. 218, 227, 243 N.Y.S. 705, 715 (2nd Dept. 1930). And in one case it does appear that an applicant was disqualified on political grounds, *inter alia*, pursuant to the "general fitness" criterion, Application of Cassidy, 268 App.Div. 282, 51 N.Y.S.2d 202 (2nd Dept. 1944). In that case, the applicant was an anti-communist who urged the creation of private armies to combat communism.

Even the Supreme Court in the first *Konigsberg* case, *supra*, and in *Schware*, *supra*, did not agree upon the meaning of the words "good moral character". There the Court acknowledged that this "unusually ambiguous" standard, "can be defined in an almost unlimited number of ways" and can be "a dangerous instrument for arbitrary and discriminatory denial of the right to practice law." 353 U.S. at 263, 77 S.Ct. at 728. In the first *Konigsberg* case, the Court assumed, without deciding, for the purposes of that case that the proper definition was the one proposed by the state's counsel, i. e., "honesty, fairness and respect for the rights of others and for the laws of the state and nation," 353 U.S. at 264, 77 S.Ct. at 728. The Court took pains to point out that "neither the definition [of good moral character] proposed by counsel nor those appearing in the California cases equates unorthodox political beliefs or membership in lawful political parties with bad moral character." 353 U.S. at 263–264, 77 S.Ct. at 728. The Court also pointed out that the California cases appeared to define " 'good moral character' in terms of an absence of proven conduct or acts which have been historically considered as manifestations of 'moral turpitude' " 353 U.S. at 263, 77 S. Ct. at 728. Mr. Justice Frankfurter, however, in his concurring opinion in *Schware*, *supra*, offered this definition: "From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have throughout the centuries, been compendiously described as 'moral character.' " 353 U.S. at 247, 77 S.Ct. at 761. These definitions are, obviously, still subject to attack on vagueness grounds, but they at least define some of those qualities which might be demanded of lawyers.[18] Professor Walter Gellhorn of Columbia

18. *Id.* at p. 40.

Law School has suggested that the standard for assessing the character of bar applicants be "dishonorable conduct relevant to the occupation" rather than good "moral" character.[19] The few New York cases in which applicants have been rejected on character grounds lend support to Mr. Justice Frankfurter's as well as Professor Gellhorn's view.[20]

In any event, it seems clear that a statutory framework which requires as a standard for admission to the bar that applicants possess the "character and general fitness requisite for an attorney", although vague, is not so vague, in the light of the foregoing definitions and its long and proper application in many cases, as to be unconstitutional on its face on the ground of vagueness.

We must, therefore, examine the manner in which the good moral character statute has been construed, implemented and applied by the defendant courts and their respective character committees. With the statute and the Court of Appeals Rule VIII as a guide, defendants have adopted vague and overly broad regulations and procedures which have resulted in a broad and sweeping inquiry into the background of bar applicants. These applicants have been required to answer questions which are vague and broad in violation of constitutional rights. cf. Schneider v. Smith, *supra*. As writers have pointed out, the terms vagueness and broadness actually involve three related problems. Note, The Void for Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960). A question may leave an applicant guessing as to its meanings. This is referred to as conventional vagueness.[21] Examples of this are revised Question 31, *supra*, which reads: "Is there any incident in your life not called for by the foregoing questions which has any favorable or detrimental bearing on your character or fitness?"; and revised Question 27(a), *supra*, which reads: "Do you believe in the principles underlying the form of government of the United States of America?" cf. Baggett v. Bullitt, *supra*.

Secondly, a question may ask the applicant for too much information, such as those cited, supra, as having been deleted by defendants, asking for a listing of membership in all organizations and a detailing of activities in each over an indefinite period of years, leaving the person questioned guessing as to the relevance of what is asked. This is one type of broadness.[22] Shelton v. Tucker, *supra*. Another example of this is Question 9 of the Second Department's present affidavit form: "Have you visited applicant's (a) parental home (b) marital home (c) any other home or place of abode applicant may have had?"

Finally, a question may define carefully the information it seeks, such as membership in the Communist Party, but cover both constitutionally protected and unprotected activity; this other type of broadness is sometimes called overbreadth.[23] Such overbreadth applies to present Question 26, supra, relating to

---

19. W. Gellhorn, Individual Freedom and Governmental Restraint 150 (1956).

20. In the cases decided by the New York courts in which applicants have been barred, it is clear that in each the conduct made the basis for refusal to admit has been dishonorable conduct relevant to the legal profession: e.g. Re Peters, 221 App.Div. 607, 225 N.Y.S. 144, aff'd 250 N.Y. 595, 166 N.E. 337, rearg. denied, 252 N.Y. 572, 170 N.E. 148 (1927) (admission denied because of disbarment in another state); Re Greenblatt, 253 App.Div. 391, 2 N.Y.S.2d 569 (1938) (admission denied because of misrepresentations to character committee about applicant's dismissal from college for misconduct); Application of Cassidy, 268 App.Div. 282, 51 N.Y.S.2d 202, aff'd on rehearing, 270 App.Div. 1046, 63 N.Y.S.2d 840, aff'd, 296 N.Y. 926, 73 N.E.2d 41 (1944) (admission denied because applicant urged creation of armed units for forceful overthrow of government and made inconsistent statements indicating lack of veracity).

21. Note, 1 Colum. Survey of Hum. Rts. L., at [pp. 54–55, *supra*] footnote 16.

22. *Id.*

23. *Id.*

membership in organizations which advocate overthrow of government by force. Recent Supreme Court decisions make it abundantly clear that neither Communist Party membership or any other membership can be used to deny admission to the bar without a showing that the applicant knows of the organization's unlawful objectives and has joined with or has acquired " 'specific intent' to further the illegal aims of the organization." Elfbrandt v. Russell, *supra;* Keyishian v. Board of Regents, *supra.* cf. Aptheker v. Secretary of State, *supra;* Haskett v. Washington, 294 F.Supp. 912 (D.D.C., Dec. 4, 1968).

Consequently, the regulations adopted by defendants, i. e., the affidavit forms and the questionnaire, fail to meet the standard of precision applicable to state regulations touching upon First Amendment freedoms. The standard was enunciated by the Supreme Court in NAACP v. Button, *supra,* where the Court ruled that "standards of permissible statutory vagueness are strict in the area of free expression," 371 U.S. at 432, 83 S.Ct. at 337, and that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." 371 U.S. at 438, 83 S.Ct. at 340. More recently, the Court reiterated this ruling in *Keyishian,* by quoting this passage from the *Button* case: "Because First Amendment Freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." 371 U.S. at 433, 83 S.Ct. at 338. The Court then quoted from another decision in this area which is also singularly applicable here: "When one must guess what conduct or utterances will lose him his position, one necessarily will 'steer far wider of the unlawful zone * * *.' Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]." 385 U.S. at 604, 87 S.Ct. at 684. For "[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions." NAACP v. Button, 371 U.S. at 433, 83 S.Ct. at 338. See also, United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967);

Dombrowski v. Pfister, *supra;* cf. Aptheker v. Secretary of State, *supra.* Mr. Justice Black's incisive observation in his dissenting opinion in the second *Konigsberg* case is apposite here: "If every person who wants to be a lawyer is to be required to account for his associations as a prerequisite to admission into the practice of law, the only safe course for those desiring admission would seem to be scrupulously to avoid association with any organization that advocates anything at all somebody might possibly be against, including groups whose activities are constitutionally protected under even the most restricted notion of the First Amendment." 366 U.S. at 73–74, 81 S.Ct. at 1019.

It is clear from all the questions cited, *supra,* that in applying the statutes attacked here, there has been an improper focus upon the applicant's political beliefs and associations and the improper use of a political test in determining admissions to the bar. Such an unlimited political focus and the use of a political test pursuant to a "good moral character" standard is foreclosed by the Supreme Court's decisions. In *Schware, supra,* the Court said: "Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church." 353 U.S. at 239, 77 S.Ct. at 756. As the Court there made clear, the focus must be on the applicant's illegal political activity, if any, and the disqualification must be on this ground, not his political beliefs or associations.

There also has been an improper invasion of the right of privacy. The hallmark of civilization is that when a man closes the door to his home and retreats to the privacy thereof the eyes and ears of the state remain outside. Griswold v. Connecticut, *supra.* The state simply cannot ask every affiant who supports an applicant for admission to the bar with whom the applicant lives or what the inside of his parents' home is like. There must be some specific information relating to those qualities expected of one about to enter the legal professions before these questions can be asked of a

particular applicant. Gibson v. Florida Legislative Investigation Committee, *supra.* Of course the state can, as it long has, require of applicants for admission to the bar that they have the "character and general fitness requisite for an attorney and counsellor at law." But these statutory words must be given such definition and application by defendants as will suggest to applicants and affiants "dishonorable conduct relevant to" the legal profession, not invasions of personal privacy and political beliefs and associations protected by the Constitution. As the Court said in Shelton v. Tucker, *supra,* " * * * even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." 364 U.S. at 488, 81 S.Ct. at 252. And in *Keyishian,* the Court said: "The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [lawyers] what is being proscribed." 385 U.S. at 604, 87 S.Ct. at 684.

This judge, therefore, holds that the "character and general fitness" statute is constitutional, but its interpretation, implementation and application by the defendant courts and their respective character committees are unconstitutional

### III. *The Second Statute*

The second statute attacked here provides that an applicant for admission to the bar must furnish satisfactory proof to the effect that "he believes in the form of government of the United States and is loyal to such government." N.Y. C.P.L.R. Rule 9406. This is clearly a political test for determining admission to the bar in violation of rights secured by the First and Fourteenth Amendment to the federal constitution. cf. Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). The "First Amendment gives freedom of mind the same security as freedom of conscience." Thomas v. Collins, 323 U.S. 516, 531, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1944). It is simply too late in our constitutional history to try to reconcile the requirements of Rule 9406 with the constitutional axiom "that one be permitted to believe what he will." American Communications Ass'n v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). All that Rule 9406 does is "[t]o force the Bar to become a group of thoroughly orthodox, time-serving, government-fearing individuals * * * [and] to humiliate and degrade" the Bar. In re Anastaplo, 366 U.S. 82, 115–116, 81 S.Ct. 978, 996, 6 L.Ed.2d 135 (1961) (Mr. Justice Black dissenting). It is nothing short of a complete irony that lawyers who fought for and won constitutional protections for other professions are the last to receive protection for themselves.

Rule 9406 is also unconstitutional on its face for another obvious reason. In an area patently involving First Amendment rights, where the consequences of failure of proof are severe and the matter to be proved is difficult of definition, the burden of proof is explicitly upon the applicant to prove that he is loyal to the government. Speiser v. Randall, *supra.*

The statute, itself, Rule 9406, says: "No person shall receive said certificate [of character and fitness] from any committee and no person shall be admitted to practice as an attorney and counselor at law in the courts of this state, unless he shall furnish satisfactory proof to the effect: 1) that he believes in the form of government of the United States and is loyal to such government." There is simply no room for the conclusion, which the majority reached in the second *Konigsberg* case, *supra,* that the

state has *not* put the burden of proof on the applicant; there it is in plain language not subject to attack on grounds of vagueness. It is clearly not a burden of simply coming forward with some evidence or going forward once the state has made out a prima facie case. Where is that in the statute or evidence before us?

Present Question 26 (relating to membership in organizations advocating overthrow of the government by force) and the present oaths required in the Questionnaire and Statement (relating to the substance of C.P.L.R. 9406) is the method by which this burden is initially put upon the applicant. The answers given to Question 26 and the oaths, which are in the form of yes and no questions, may lead to further questioning upon the personal interview. This has never been seriously denied by defendants and is clearly authorized by the requirement that an investigation be made. N.Y.C. P.L.R., Rule 9401. Consequently, in this case, as in Speiser v. Randall, *supra,* more is involved than the taking of a conclusive oath of non-criminal political conduct such as was involved in the oath cases referred to by the majority here as justification for requiring the second question oath of lawyers. In those cases, the Supreme Court sustained the validity of loyalty oaths required of public employees, Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L. Ed. 1317 (1951); candidates for public office, Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951); and officers of labor unions, American Communication Ass'n v. Douds, *supra.* But, as the majority points out in *Speiser,* "If the person took the oath he retained his position. The oath was not part of a device to shift to the office holder the burden of proving his right to retain his position." *Id.* 357 U.S. at 528, 78 S.Ct. at 1343. Here as in *Speiser,* the answers to questions 26 and the oath questions are "only a step in a process throughout which the [applicant] must bear the burden of proof." *Id.* The applicant may be questioned indefinitely and may be required to produce additional affidavits. In this process, an applicant must obviously defend his negative answer, expose and defend his writings, his speeches, his membership in various organizations and his political beliefs.

The procedures here do not involve a standard of proof which would require the character committees to go forward to prove disqualification on grounds of illegal political activity once the applicant has made a prima facie case. The committee may delay its interrogation indefinitely or deny admission altogether, as the Questionnaire and Statement warn, for failure to answer fully any question.

Defendants, in their brief, do not even make an attempt to dull the luster of one of plaintiffs' brightest gems, Speiser v. Randall, *supra;* for there is the heart of plaintiffs' case. Questions relating to loyalty to the government clearly tread upon First Amendment territory. Consequently, as the Court said in *Speiser,* "Where the transcendant value of speech is involved due process certainly requires in the circumstances of this case that the State bear the burden of persuasion" to show that the applicant is guilty of illegal political conduct. "The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized." 357 U.S. at 526, 78 S.Ct. at 1342.

The burden of proving loyalty to the government here, as in *Speiser,* can have but one effect on a prospective lawyer's First Amendment freedoms, and that is a chilling effect if not a freezing one. "The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens." *Id.* at 526, 78 S.Ct. at 1342. See also Elfbrandt v. Russell, *supra,* 384 U.S. at 17–18, 86 S.Ct. 1238, and Abington

School District v. Schempp, 374 U.S. 203, 289–290, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). (Mr. Justice Brennan concurring). Moreover, a person who must spend long years in preparation and invest large sums of money to enter the legal profession is clearly going to be more prone "to steer far wider of the unlawful zone."

Here an applicant for admission to the bar has the burden of proving that he is loyal to the government. If in the opinion of some members of the character committee he should fail in this burden, he is denied the requisite certificate. This means that the applicant is denied the opportunity to enter the profession for which he has spent large sums of money and much time in study. "So far as I am concerned the consequences to the applicant whether considered from a financial standpoint, a social standpoint, or any other standpoint I can think of, constitute a more serious 'penalty' than that imposed upon Speiser," Konigsberg v. State Bar of California, *supra*, 366 U.S. at 77, 81 S.Ct. at 1021, Mr. Justice Black dissenting.

If, as in *Speiser*, the state cannot constitutionally impose upon a veteran seeking a tax exemption the burden of proving loyalty to our government, by what reasoning can the state constitutionally impose such burden on one seeking a license to practice law? Defendants did not answer this question to the satisfaction of this court and did not cite any case to sustain their position other than the second *Konigsberg* case where the Court explicitly found the burden was not on the applicant.

Finally, Rule 9406 is likewise unconstitutional on its face since it lacks sufficient standards for determining who shall be admitted to the bar. It has that same quality of "extraordinary ambiguity" condemned by the Court in describing the statutory framework in *Keyishian, supra*, 385 U.S. at 604, 87 S.Ct. 675. There vague statutory language was held unconstitutional. One statute required the discharge of a teacher for "the utter-

ance of any treasonable or seditious word or words or the doing of any treasonable or seditious act", *Id.* at 593, 87 S.Ct. at 678. Another statute barred persons from employment as teachers who "by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine" of forceful overthrow of government. *Id.* at 599, 87 S.Ct. at 682. The language of Rule 9406 is equally vague. The language of Rule 9406 is "wholly lacking in 'terms susceptible of objective measurement.'" *Id.* at 604, 87 S.Ct. at 684. And "men of common intelligence must necessarily guess at its meaning and differ as to its application * * *." Baggett v. Bullitt, *supra*, 377 U.S. at 367, 84 S.Ct. at 1320. The words "loyal to such government" are no more definite than the phrase "'respect for * * * the institutions of the United States of America * * * and undivided allegiance to the government * * *'" found lacking in ascertainable standards in *Baggett*. *Id.* at 361, 84 S.Ct. at 1317.

Pursuant to this vague statute, defendants require applicants on the Questionnaire and Statement to answer these questions: "Do you believe in the principles underlying the form of government of the United States of America? Can you conscientiously, and do you, affirm that you are, without any mental reservation, *loyal to and ready to support the Constitution of the United States?*" The italicized words constitute the amended portion of this oath. This amendment was made just prior to the filing of these actions. This second question formerly read: "Can you conscientiously and do you affirm that you are, without any mental reservation, loyal to the Government of the United States?" The first question was also amended to delete the requirement that the applicant write, in not less than 100 words, what he believes those principles underlying our form of government to be. These amendments, however, do not rescue these oaths from the stamp of unconstitutionality.

These questions are oaths for purposes of perjury under New York law. Under the law, oath includes an affirmation N.Y.Penal Law, McKinney's Consol. Laws, c. 40, § 210.00. When an applicant answers the second question in the affirmative he has unquestionably taken an oath. Moreover, applicants are warned that the statement is one made under oath. Consequently, when the applicant answers the first question, *supra,* and then swears or affirms at the end of the Questionnaire and Statement, as required, to the truth of his affirmative answer, the applicant has taken an oath to which the penalties for perjury attach, the same as in Whitehill v. Elkins, *supra,* and Elfbrandt v. Russell, *supra.*

If the oath required in Whitehill v. Elkins, *supra,* ("I am not engaged in one way or another in the attempt to overthrow the government of the United States") is constitutionally unacceptable for teachers because too vague and broad when read in the light of the membership statute to which it was tied; and if the oath in Baggett v. Bullitt, *supra,* ("I will * * * promote respect for the flag and the institutions of the United States * * * and undivided allegiance to the government") cannot constitutionally be required of teachers because it is also vague and broad; and if the oath required of teachers in Cramp v. Board of Public Instruction, *supra* ("I have not and will not lend my aid, support, advice, counsel or influence to the Communist Party") is likewise vague and broad; pursuant to what rationale shall lawyers be required to take the vague and broad oaths here? It has been suggested that there is none and that there is more reason for applying generous First Amendment standards in bar admission cases than in public employment cases.[24] The most important reason is that teachers, for example, are employees of the state while lawyers are employed by their clients to whom they owe their first obligation. This difference would seem to justify greater regulation of

teachers than lawyers. Lawyers are officers of the court only in the sense that they are subject to the discipline of the court and are under an obligation not to hinder the administration of justice. Teachers and other public employees are employed directly by the state which thus has the added interest of an employer. The majority here holds that lawyers are in a special category and may, therefore, be required to take an oath such as those upheld as to "a limited class of persons in or aspiring to public positions by virtue of which they could, if evilly motivated, create serious danger to the public safety." *Garner, supra; Gerende, supra;* American Communications Ass'n, *supra.* But the majority pointed out in Speiser v. Randall, *supra,* that in those cases there was no attempt directly to control speech, as in the instant case, but rather to protect, from some evil shown to be grave, some interest clearly within the sphere of governmental concern. What danger to the public is actually created by a "subversive" lawyer? Again, this question has been thoroughly examined.[25] The conclusion is that the danger is small and that, in any event, adequate remedies in the form of criminal penalties and disbarment already exist to punish and deter irresponsible conduct.

Finally, it seems clear that a determination as to the vagueness and broadness of these oath questions must be undertaken as a necessary requisite to any consideration of the obstruction by an applicant of the investigative process by refusing to answer these oath questions. cf. Whitehill v. Elkins, *supra.* Rule 9406's language, "loyal to such government" and the first question's language, "principles underlying the form of government" are certainly broad enough to encompass constitutionally protected dissent and protest activity against certain governmental policies and principles. There has been no attempt by statute, rule, regulation, or court decision to enlighten anyone as to what utterances

---

24. *Id.* at 52.

25. *Id.* at 40.

or what activities may be construed as disloyalty to our government or contrary to the principles underlying our form of government. Clearly, law students who dissent from this government's policies with respect to the war in Vietnam have a ground for concern as to whether they are loyal to the government. "It is no answer to say that the statute would not be applied in such a case. We cannot gainsay the potential effect of this obscure wording on 'those with a conscience and scrupulous regard for such undertakings.'" *Keyishian, supra,* 385 U.S. at 599, 87 S.Ct. at 681.

As to the oaths embodied in the two questions, defendants argue that examination of the New York statutory scheme discloses that both the Legislature and the Court of Appeals treat members of the bar as officers of the courts who, as such, are required to take the constitutional oath of office. Accordingly, say defendants, the requirements of C.P.L.R. 9406, that a person shall not be admitted to the bar unless he furnishes "satisfactory proof to the effect that he believes in the form of government of the United States and is loyal to such government" must be construed in harmony with its purpose, i. e., to test merely that the applicant, if approved, can truly and honestly take the constitutional oath of office. Thus, defendants plead, C.P.L.R. 9406 may not be deemed to be either vague or unconstitutional; it merely requires, in substance, that a law officer-to-be affirm that he believes in and is loyal to our constitutional form of government the same as any judge or other state officer.

In reply, plaintiffs' points are exceedingly apt. First, there is no attack made here upon the requirement that every person upon being admitted to the bar take the promissory oath given to all state officers to support the state and federal constitutions which is required by the New York Constitution, Article XIII, § 1. New York Judiciary Law § 466.[26]

Secondly, plaintiffs say that the attempt to save these vague oaths as to belief by assimilation with the constitutional oath of office cannot succeed. The fact is that the authority to prescribe these oaths derives from C.P.L.R. 9406 which is a statutory prerequisite for admission to the bar and, consequently, must be considered with reference thereto and not with reference to the Constitutional oath already required of lawyers and to which plaintiffs do not object. Even if we accept defendants' contention that C.P.L.R. 9406 and these oaths must be construed in light of the constitutional oath, as the Court said in Whitehill v. Elkins, *supra,* 389 U.S. at 61–62, 88 S.Ct. at 187 the statute and these oaths are still "befogged". We find here, as the Court found there, "an overbreadth [discussed supra] that makes possible oppressive or capricious application" as character committee personnel and appellate division justices change. That very threat may deter the unfettered exercise of First Amendment freedoms by law students as much as successive suits for perjury. This statute and these oaths are just another classic example of the often cited need for legislation drawn with precision in this sensitive and important First Amendment area. cf. Whitehill v. Elkins, *supra.*

The distinction between promissory oath and test oath of the kind here involved was recognized long ago. Ex parte Garland, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866). The oaths involved here are not promissory oaths to support the Constitution of the State and the United States as in the case of the constitutional oath. The fact that these oaths are in the form of "yes" and "no" questions is of special significance. If the applicant does not give the desired answer, which in this case is "yes", he may be questioned further, delayed in

---

26. "I do solemnly swear (or affirm) that I will support the Constitution of the United States, and the Constitution of the State of New York, and that I will faithfully discharge the duties of the office of.........., according to the best of my ability."
N.Y.Const., Art. XIII, § 1.

his admission, or disqualified without further questioning. He is warned of this on the front of the Questionnaire and Statement. In short, he must carry the burden of proof that he is qualified for admission. These oaths are not simply a promise to support the Constitution. These are oaths which require an applicant to disclaim past or present constitutionally protected political beliefs or activities. It is for this reason, i. e., that these oaths are too vague and too broad, that they cannot be equated with the constitutional oath.

Finally, plaintiffs "strike home" with another gem out of their storehouse of recent precedent, Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). There the state had claimed, as here, the right to examine the officer-to-be to test his sincerity and ability to take the constitutional oath there prescribed. The Court ruled in response to this claim in the *Bond* case, at 132, 87 S.Ct. at 347, that such a power could not be conceded because of its obvious susceptibility to abuse which it went on to demonstrate. Again, the Court made clear that there must be some specific evidence of the prospective officer's inability to take the oath before any such inquiry becomes proper. It simply cannot be done in every case.